IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 14, 2006 Session

## REESE L. SMITH JR. v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Robertson County**
**No. 03-0488        Michael R. Jones, Judge**

---

**No. M2005-01309-CCA-R3-PC[1] - Filed June 28, 2006**

---

The Defendant, Reese L. Smith Jr., was convicted of two counts of impersonating a licensed professional, and the trial court sentenced him to concurrent sentences of two years for each count to be served on probation. On appeal, the Defendant seemingly contends that the evidence is insufficient to sustain his convictions. Finding that there exists no reversible error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Reese L. Smith, Jr., Springfield, Tennessee, Pro se.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; John W. Carney Jr., District Attorney General; Dent Morriss, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION
### I. Facts

This case arises from the Defendant's actions while he was assisting other people facing criminal charges. The Defendant was indicted for two counts of impersonating a licensed professional, specifically a licensed private investigator. At the Defendant's trial on these charges where, against the strong advice of the trial court the Defendant represented himself, the following evidence was presented: Donna Hancock testified that she is employed with the Department of Commerce and Insurance for the State of Tennessee and that she is the Executive Director for the Tennessee Private Investigation Polygraph Commission. Hancock said that there are approximately

---

[1]While the Defendant filed a Petition for Post Conviction Relief, and the Clerk of this Court docketed the appeal with a post-conviction number, we note that the appeal is actually a direct appeal.

fourteen hundred licensed private investigators working at approximately one thousand companies providing investigation services in Tennessee. She identified and provided the Tennessee Private Investigator's Laws and Rules Booklet, which is a result of Tennessee Code Annotated section 62-26-202 that regulates private investigators.

Hancock testified that this statute defines an investigation company as "any person who engages in the business or accepts employment to obtain or furnish information with reference to" several listed items. One listed item was to "accept employment or obtain information regarding a crime or wrongs done or threatened against the United States or any state or territory of the United States" or "[t]he identity, habits, conduct, business occupation, honesty and integrity, credibility, knowledge, trustworthiness, efficiency, loyalty, activity, movement, whereabouts, affiliations, associations, transactions, acts, reputations, or character of any person." Two other listed items include locating or recovering lost or stolen property and attempting to determine the responsibility of a fire. Hancock agreed that a private investigator is a person who performs one or more of these services and that a licensed investigator must apply and meet certain standards and requirements. She said that a licensed investigator must be twenty-one years of age, a citizen or resident alien of the United States, take an examination for proficiency in the industry and knowledge of State laws and rules, undergo a background check, and be affiliated with a licensed investigations company. Hancock testified that the total fees required to become licensed are $350.00. She sated that the law also requires that every licensee obtain six hours of continuing education acceptable to the Commission each calendar year. Hancock testified that there is a nine member Tennessee Private Investigation Commission that meets about every other month to hear issues involving private investigators, including complaints against licensed private investigators and against individuals who are involved in unlicensed investigating activity.

Hancock testified that she conducted a thorough search of records contained in her department and FAI Investigative Facts is not a licensed investigation company. She said that she also conducted a thorough search of the departmental records and determined that Reese L. Smith Jr., the Defendant, was not a licensed private investigator. She said that a complaint was filed against the Defendant, which triggered her looking into whether he was licensed. She said that, after she determined that he did not have a license, she sent the Defendant a letter directing him to cease and desist operating as a private investigator. Hancock testified that, as of the morning of the trial, neither FAI Investigative Facts nor the Defendant had become licensed.

On cross-examination, Hancock said that she had not received any complaints from the Nashville courts about the Defendant. Hancock testified that she had received one complaint against the Defendant and that was filed by Chief Mike Wilhoite with the Springfield Police Department. She said that she did not swear a warrant out against the Defendant because that was not part of her job; rather she sent him a cease and desist letter. She testified that she never investigated whether the Defendant had a business license because that is not part of her search. Hancock agreed that the Defendant offered a response to the cease and desist letter.

On redirect examination, Hancock identified the complaint from the Springfield Police

Department and attached to it was a copy of an identification card for "R.L. Smith, Special Agent of FAI Investigative Facts" with the ID number 6525 listed. On re-cross examination, Hancock said that she never asked the Defendant what the significance of the identification number 6525 was and said that she was unaware that the Defendant had been sentenced to thirty years in prison in 1980. She said that, had the Defendant applied for a license, she would have conducted a background investigation on him and discovered this information.

Laurie Pack testified that she is the office manager for the Springfield Police Department and in this capacity she contacted the Defendant in April of 2003. She said that the Defendant requested permission to look in one of the personnel files, and Pack informed him that he would have to talk to the chief first. The Defendant presented her a card on which was written "Falsely Accused" and the Defendant's name. Pack agreed that she concluded that the Defendant was an investigator of some sort. Pack gave the Defendant a form to fill out, and the Defendant said that he did not want to provide some of the information. He said that he did not want to show her his driver's license, but he did finally show her his driver's license. Pack said that the Defendant told her that he interviews people and that he records those interviews and then asked her if Chief Wilhoite would be interested if he came across anything that the police department had done wrong. Pack told him that the chief might be interested but that she could not speak for Chief Wilhoite. Pack testified that the Defendant told her that if he came across any reprimands or suspensions in the personnel files that he would want copies of those. On cross-examination, Pack said that the Defendant never told her that he was an investigator. She said that the Defendant did tell her that he was looking in the personnel files because he had a client.

Chief Mike Wilhoite testified that he is the Chief of Police for the City of Springfield and that, during the week of April 7, 2003, he met the Defendant. Chief Wilhoite said that the Defendant told him that he wanted to look at personnel records for the officers, and the chief asked him if he was with any sort of firm or business. The Defendant said that he was with FAI and that he wanted to look at some of the personnel files because he had been falsely accused and was working on the cases of other people who had also been falsely accused. The chief told the Defendant that as long as the Defendant abided by the Tennessee Code Annotated he could look at the personnel files.

Chief Wilhoite testified that the Defendant had with him a leather case that had FAI business card agent and a number on one side and what appeared to be a military I.D. on the other side. The chief said that he asked the Defendant if he was working for an attorney or on his own as some type of investigator, and the Defendant said that he was out working on his own. Chief Wilhoite gave the Defendant a document that must be filled out in order to obtain personnel files, and he agreed that the Defendant was reluctant to give his home address or telephone number. The chief testified that the Defendant filled out the form on April 7th but did not take the personnel file until April the 11th. Chief Wilhoite said that the Defendant also provided a post office box address when he filed out the form on April 7th, and, before the Defendant returned on April 11th, the chief learned that the Defendant lived on Maple Street. He asked the Defendant about this when the Defendant returned on the 11th, and the Defendant said that he was reluctant to give his correct address because of the line of work in which he was involved. The chief noticed that the Defendant was carrying a

pair of handcuffs in his pants like a detective. From all of these actions, the chief concluded that the Defendant was holding himself out as an investigator. The chief said that he takes complaints against his officers very seriously, and he takes actions on those complaints. He agreed that it is not uncommon to suspend an officer in response to those complaints.

On cross-examination, the chief indicated that he did not file a warrant against the Defendant and have him arrested. Chief Wilhoite said that he received two complaints against the Defendant. He said that the Defendant never told him that he was an investigator. The chief also explained that he filled out a complaint against the Defendant in which he said that the Defendant's I.D. card listed the name "investigative facts," but he later learned that the Defendant's I.D. card actually said "investitive facts." The chief also agreed that the complaint alluded to a problem between the Defendant and Judge Fagan, and the chief said that this allusion was based upon rumor.

William Watkins, a lieutenant with the Springfield Police Department, said that he is the supervisor of the criminal investigation and narcotics divisions and that he supervises five officers. He agreed that he met the Defendant in April of 2003 when the Defendant came into his office inquiring about Jeffery Farmer's arrest by one of Lieutenant Watkins's detectives. The Defendant told the lieutenant that he was hired by the Farmer family to look into the case and explained that he worked for a company, Falsely Accused Investigative Services, that he had taken over from another gentleman who had passed away. Lieutenant Watkins said that the Defendant told him that he was previously paid to be an investigator and that he was now the owner and operator of the business. On cross-examination, the lieutenant said that he did not file a warrant against the Defendant. Lieutenant Watkins maintained that the Defendant told him that he was an investigator.

Robert Murray, a sergeant with the Springfield Police Department, testified that he saw the Defendant when he was on or near a Springfield housing authority property near a building belonging to the Federal Housing Authority. Sergeant Murray said that there were several people there, and his orders were to not allow them to congregate or cause a disturbance on or about the housing authority property. The sergeant said that the Defendant was wearing a gold badge displayed in his left breast area, maybe on a pocket. Sergeant Murray asked the Defendant who he was and described the Defendant as "evasive" about who he was and who he was with. The officer asked the Defendant about the badge because he was unsure whether the Defendant was there in an official capacity. Sergeant Murray said that the Defendant attempted to hide his badge, but he saw words to the affect of "wrongfully accused" written on the badge. The Defendant told the officer that he was conducting an investigation and referenced certain officers in the department.

On cross-examination, Sergeant Murray said that he wrote a memo about the incident on October 17, 2000. The officer said that the Defendant told him that he was there to investigate a matter, and the officer inferred that the Defendant was an investigator. The officer said that he did not file a warrant against the Defendant, and he did not testify about this case before the Grand Jury.

Rita Heatherly, a sergeant with the Robertson County Sheriff's Department, testified that she was working at the Robertson County jail in May of 2003 when the Defendant came into the jail to

see Jeffery Farmer, an inmate. Sergeant Heatherly said that the Defendant presented himself as an investigator working on Farmer's case. The sergeant told the Defendant that, because he was not an attorney, he had to call to make an appointment and that the Defendant had not called to schedule an appointment. The Defendant told her that he had been to the jail before to see Farmer and that the jail administrator, Lieutenant Jones, would not care if he visited Farmer. Sergeant Heatherly called Lieutenant Jones, and the lieutenant said that the Defendant had not verified his appointment with the lieutenant. Sergeant Heatherly testified that the Defendant also told her that his visit had been approved by the Sheriff and the Chief, which she later learned was untrue. Further, the Defendant told her that he was there to investigate because he was going to court.

Sergeant Heatherly said that the Defendant showed her a Tennessee Identification and a business card. She said that she never permitted the Defendant to see Farmer because Lieutenant Jones instructed her to tell the Defendant to return the following Monday at 9:00 a.m. The sergeant testified that, based on his observation, the Defendant held himself out to be a licensed investigator. On cross-examination, the sergeant said that, when an inmate has a visitor, the visitor must provide identification, which is held by the officers until the visitor leaves. Sergeant Heatherly said that Lieutenant Jones and Sheriff Bollinger told her to file a warrant against the Defendant, and she did so the following Monday. On redirect examination, Sergeant Heatherly identified the warrant that she took out against the Defendant. She noted that she swore to it on May 5th, the day after the Defendant had come to the jail. The sergeant said that she ran the Defendant's record and discovered outstanding charges from Nashville and brought this to the attention of her supervisor. Sergeant Heatherly said that she determined that there was an arrest warrant charging the Defendant with impersonation of a licensed professional that was served on the Defendant on January 9, 2004. These charges were brought against the Defendant by the Springfield Police Department.

James H. Taylor testified on the Defendant's behalf that he asked the Defendant to talk to Taylor's attorney when Taylor was having a legal problem. He said that the Defendant never told him that he was an investigator. On cross-examination, Taylor agreed that he was the Defendant's father-in-law.

Michael Farmer testified that he had heard of the Defendant through literature, and he contacted the Defendant to assist him with Farmer's brother's case. He said that he wanted the Defendant to find out what his brother was accused of because his brother's attorney would not tell him. Farmer said that his church asked the Defendant to preach one Sunday, and Farmer knew the Defendant was a minister. Farmer said that the Defendant never told him that he was an investigator or with the police. Farmer stated that the Defendant did visit Farmer's brother in jail twice, once to obtain documents that Farmer could not get otherwise. Farmer said that he was with the Defendant when the Defendant interviewed witnesses, and the Defendant never told the witnesses that he was an investigator. On cross-examination, Farmer admitted that, after the Defendant's help, his brother pleaded guilty to facilitation of aggravated burglary. On redirect examination, Farmer said that the Defendant retrieved information proving that Farmer's brother was innocent, and that was the information that the Defendant was trying to leave at the jail when he was arrested.

Darryl Scott testified that the Defendant approached him about a case involving a man named Morris, but the Defendant never identified himself as an investigator. He also said that he was never interviewed about this case by anyone from the District Attorney's office, the police department, or the Sheriff's office. On cross-examination, Scott testified that the Defendant came and asked him questions about a case that he was involved with, asking him questions about what he knew. Scott agreed that the Defendant was collecting information like an investigator would collect information. On redirect examination, Scott testified that the Defendant was not wearing a suit when he interviewed him, and he was not dressed professionally. He said that the Defendant appeared as an "ordinary person." On re-cross examination, Scott said that the Defendant was asking him about a detective with the Springfield Police Department and about a piece of paper that Scott signed. Scott agreed that the Defendant questioned him about something to do with a crime, specifically a burglary.

Troy Dwayne Chatman testified that he had an unemployment meeting at the Metro Center, and the Defendant went with him because Chatman's grandmother, who is also the Defendant's mother-in-law, asked the Defendant to go in case Chatman did not understand what was said at the meeting. Chatman said that, while he was at the meeting, Chatman never spoke with Chief Wilhoite or with any of his officers, and he never told anyone that the Defendant was an investigator. Chatman said that the Defendant did not go with him as an investigator.

James Johnson, Sr., testified that, on October 17, 2000, the Defendant came and met him at his home, and the two went to another location where they were talking to the police. Johnson said that the police had run some children off of a grassy area where the children were playing, and Johnson and the Defendant were talking to the police officers about where the children had to play. Johnson said that the Defendant never told him that he was an investigator and never approached the police officers as an investigator. Johnson testified that an officer, Officer Murry, came up to the scene also and was acting as an "aggressor" wanting to know who the Defendant was. Johnson told the jury that both he and the Defendant are ministers. Johnson said that he had not been interviewed by the police or the District Attorney's office with respect to this case. On cross-examination, Johnson said that he did not remember whether the Defendant wore a badge when he came to his home.

Latisha Quarles testified that she has known the Defendant for three years and that she has asked for his assistance on two or three occasions. She said that she had been to court twice and that the first time was because her truck had been stolen. Quarles recalled that she asked for the Defendant's assistance because she was unsatisfied with the police investigation, and the Defendant called some of his friends in the Metro Police Department, and they found her truck. Quarles said that the Defendant never approached her as an investigator, and the Defendant was never asked to leave the courtroom when he was there with her. Quarles said that the second time that she was in court and asked for the Defendant's assistance was on a harassment charge. She asked the Defendant to get her a bail bondsman, and the Defendant found one for her. Quarles recalled that she gave the Defendant power of attorney, and after he talked to the woman who brought the harassment suit the woman dropped the charges. Quarles said that she has asked for the Defendant's help a third time

because she never received restitution from when her truck was stolen, and the man who stole it is out of jail and working at the dealership where she bought the truck.

On cross-examination, Quarles agreed that the Defendant helped her get her truck back and that he helped her in a criminal matter. He also helped her when she was charged with harassment, a criminal charge. The Defendant went to the person who had accused her of harassment and, after talking with her, got her to drop the charge. On redirect examination, Quarles agreed that she went to the Defendant for help because she did not understand what to do in her situation. She said that she gave him power of attorney.

Gloria Smith, the Defendant's wife, testified that she met the Defendant in 2000 and that he told her that he helped the public by assisting them in putting their cases together and making sure that their rights "are used in a correct way." Smith testified that the Defendant never said that he was an investigator, and he helped at least three or four of her friends. In one instance, the Defendant helped Smith's friend's sister, who was going to prison for attempted murder. She said that he helped her as a friend and assisted her lawyer, but he was not acting as a lawyer or an investigator. Smith said that the girl's case was dismissed.

Jeffery Farmer testified that he was incarcerated in April and that the Defendant had come to see him twice, and the Defendant left both times without being arrested. The Defendant planned to bring him documents the third time that the Defendant planned to come and see him. Farmer said that his brother approached the Defendant to help Farmer. Farmer said that the Defendant never told him that he was an investigator. On cross-examination, Farmer said that he had pleaded guilty and received some rehabilitative treatment.

Lieutenant Gerald Jones testified that he is married to the Defendant's wife's cousin. He said that he never met the Defendant, and he did not know of the Defendant until after the Defendant was arrested. Lieutenant Jones said that he knew that the Defendant was "supposed to be" a minister. The lieutenant then identified the Defendant's preaching license. On cross-examination, Lieutenant Jones said that, at the time of the Defendant's arrest, there were 150 to 170 inmates in the Robertson County jail. The lieutenant said that he did not know the Defendant at the time of the Defendant's arrest, and he did not know that the Defendant had married his wife's cousin.

Based upon this evidence, the jury convicted the Defendant of two counts of impersonating a licensed professional.

## II. Analysis

Although it is not clear, it appears on appeal that the Defendant is challenging the sufficiency of the convicting evidence. His brief contains no citations to the record and no citations to any legal authority to support his contention. Further, he fails to provide any argument to support his contention that the evidence is insufficient to sustain his conviction. Because the Defendant's brief, and reply brief, are devoid of any of the required citations and argument, he has risked waiver. See Tenn. Ct. Crim. App. R. 10(b) (Issues which are not supported by argument, citation to authorities

or appropriate references to the record will be treated as waived in this court."). In the interest of justice, we will review the issue on its merits.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004) (citing State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Caroll v. State, 370 S.W.2d 523 (1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775 (citing State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Tennessee Code Annotated section 66-26-207 (1997) requires that a private investigator must be licensed and delineates the requirements for a license. Any person acting as a private investigator alone or with a company is defined as an "[i]nvestigations company." Tenn. Code Ann. § 62-26-202(6) (1997). Further, and:

> "Investigations company" means any person who engages in the business or accepts

employment to obtain or furnish information with reference to:
(A) Crime or wrongs done or threatened against . . . any state . . . .;
(B) The identity, habits, conduct, business, occupation, honesty, integrity, credibility, knowledge, trustworthiness, efficiency, loyalty, activity, movement, whereabouts, affiliations, associations, transactions, acts, reputations or character of any person;

. . . .

(E) The securing of evidence to be used before any court, board, commission, officer or investigating committee;

Tenn. Code Ann. § 62-26-202(6)(A), (B) & (E).

Tennessee Code Annotated section 39-16-302 (2003) makes it a crime to impersonate a licensed professional. It states, "It is unlawful for any person who is not licensed to do so, to practice or pretend to be licensed to practice a profession or which a license certifying the qualifications of such licensee to practice the profession is required." Tenn. Code Ann. § 39-16-302(a). In order to obtain a conviction pursuant to that statute, the State must prove beyond a reasonable doubt that a defendant: (1) practiced or pretended to be a licensed to practice as a private investigator; (2) that private investigation is a profession in the State of Tennessee requiring a license certifying the qualifications of such licensee to practice; (3) that the defendant was not licensed to practice in the profession of private investigation in the State of Tennessee; and (4) that the defendant acted either intentionally, knowingly, or recklessly. See T.P.I. – Crim. 24.03 (6th ed. 2005). "Recklessly" means that a person acts recklessly with respect to circumstances surrounding the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. Tenn. Code Ann. § 39-11-301(c) (2003).

In the case under submission, we conclude that when viewed in the light most favorable to the State the evidence proves all of the necessary elements of this offense for both of the Defendant's convictions. The evidence proved that a private investigator is a person who must be licensed in the State of Tennessee to accept employment or obtain information regarding a crime or wrongs done and also licensed to accept employment or obtain information about the identity, habits, credibility, knowledge, trustworthiness, activity, movement, reputations, or character of any person. Further, the evidence proved that the Defendant was not licensed as a private investigator, but he carried an identification card listing his name and title as a "Special Agent of FAI Investigative Facts" and an identification number. The Defendant requested permission to look at the personnel files of one of the officers of the Springfield Police Department, and he presented his identification card. The Defendant said that he interviews people and records the interviews and then asked if Chief Wilhoite would be interested in information about anything that the police had done wrong. The Defendant, who was carrying a pair of handcuffs, told Chief Wilhoite that he was with FAI and wanted to look at the personnel files because he was working on the cases of other people who had been falsely accused. The Defendant told another Springfield Police Department officer that he was inquiring about Jeffery Farmer's arrest because he was hired by the Farmer family to look into the case. He said that he worked for Falsely Accused Investigative Services, a company that he took over from

-9-

someone who had passed away. He said that he had previously been paid to be an investigator and was now the owner of the company. This evidence clearly shows that the Defendant engaged in the practice of private investigation, as defined by statute, and that he acted, at the very least, recklessly with respect to his behavior.

Further, as to the second count of impersonating a licensed professional, the evidence proved that the Defendant went to the Robertson County jail to see Jeffery Farmer, who was an inmate. The Defendant presented himself as an investigator and said that he was there to investigate because he was going to court. Michael Farmer, the inmates brother, testified that he contacted the Defendant to assist him with his brother's case and that the Defendant visited his brother in jail twice. This evidence proves that the Defendant engaged in the practice of private investigation, as defined by statute, and that he acted, at the very least, recklessly with respect to his behavior. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE