# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 12, 2008

## STATE OF TENNESSEE v. BRITT ALAN FERGUSON

**Appeal from the Circuit Court for Obion County**
**No. C07-161A      William B. Acree, Judge**

---

**No. W2008-00945-CCA-R3-CD  - Filed December 29, 2008**

---

The defendant, Britt Alan Ferguson, was convicted by an Obion County jury of facilitation of the initiation of a process intended to result in the manufacture of methamphetamine, a Class C felony; two counts of promotion of the manufacture of methamphetamine, a Class D felony; unlawful drug paraphernalia use and activities, a Class A misdemeanor; and two counts of possession of a controlled substance, a Class E felony;[1] and was sentenced by the trial court as a multiple offender to an effective sentence of six years in the Department of Correction.  Following the denial of his untimely motion for new trial, he filed an untimely notice of appeal to this court, challenging the sufficiency of the evidence in support of his methamphetamine and drug paraphernalia convictions and arguing that the trial court erred in denying his motion to suppress evidence.  The State responded with a motion to dismiss on the basis that both the motion for new trial and notice of appeal were untimely.  This court granted the motion in part, ruling that the defendant had waived the suppression issue by his untimely motion for new trial but that we would waive the untimely notice of appeal in order to consider the sufficiency of the convicting evidence.  Following our review, we conclude that the evidence is sufficient to sustain the convictions.  Accordingly, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

James T. Powell, Union City, Tennessee, for the appellant, Britt Alan Ferguson.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1]The parties stipulated that the defendant had two or more prior felonies under the simple possession of a controlled substance statute, which elevated his convictions to Class E felonies.

# OPINION

## FACTS AND PROCEDURAL HISTORY

On February 22, 2007, officers of the Union City Police Department observed the defendant and his codefendant, Wade Glover, standing beside Glover's pickup truck outside the defendant's residence. A white object fell to the ground between the two men, and the defendant picked it up and placed it inside the truck's wheel well. The officers retrieved the object, a plastic bag containing lithium batteries and crushed pseudoephedrine tablets, and arrested and searched the defendant, uncovering on his person wire cutters, a stripping tool, a pair of latex gloves, and thirteen pills, including four Valium pills and one morphine pill. The officers also found a half-gallon of Coleman fuel in the truck, hypodermic needles in a purse on the front porch of the house, and other items inside the house.

The defendant was subsequently indicted with Glover for one count of the initiation of a process intended to result in the manufacture of methamphetamine, two counts of promotion of the manufacture of methamphetamine, and one count of unlawful drug paraphernalia use and activities. He was indicted alone on a separate count of unlawful drug paraphernalia use and activities and two counts of possession of a controlled substance.

At the hearing on the defendant's motion to suppress, the State conceded that the search of the residence was illegal and, thus, that the evidence uncovered in the house and on the porch should be suppressed. As a result, the State subsequently dismissed one of the two paraphernalia charges. At the conclusion of the hearing, the trial court denied the defendant's motion to suppress with respect to the remaining evidence, ruling that the items found in the truck and on the defendant's person were admissible at trial.

At the October 9-10, 2007 joint trial of the defendant and Glover, Jody Emery testified that on February 22, 2007, officers from the Union City Police Department came to his home in response to a tip that he was manufacturing methamphetamine. He said he gave them permission to search his residence and vehicles, but they did not find anything and he was never arrested. Because he believed that the defendant had "set [him] up," he telephoned the defendant in the presence of the police to ask if he and Glover still "wanted to make some dope." According to Emery, the defendant replied yes. Emery testified that the previous night the defendant and Glover had been using methamphetamine with him at his house when the defendant announced his intention of manufacturing some methamphetamine and asked Emery if he had any anhydrous ammonia. Emery said he told the defendant that he did not have any and did not want to get involved. On cross-examination, he acknowledged that the defendant's conversation had not included any definite plans with respect to his manufacture of methamphetamine.

Investigator Derrick O'Dell of the Union City Police Department testified that on February 22, 2007, he and fellow officers went to the residence of Jody Emery, who was on parole and with whom Investigator O'Dell was familiar, in response to a Crime Stoppers tip that there was an active methamphetamine laboratory at the location. Although the officers found no evidence of a methamphetamine laboratory, Emery provided them with a tip about the defendant and Glover. In

-2-

response, the officers drove to the defendant's residence, located at 419 Denver Road in Union City.

Investigator O'Dell testified that he was in the first vehicle to arrive at the defendant's residence. As he was pulling up, he saw the defendant and Glover standing outside the residence beside Glover's Chevrolet pickup truck, which was equipped with a "lift kit." The defendant was holding a floor mat and a whisk broom, and both men turned to look up the road as the officers' vehicles approached the residence. The men then moved to the front of the vehicle and were standing approximately two and a half feet apart when Investigator O'Dell saw a white object fall to the ground between them.

Investigator O'Dell testified that the men appeared to engage in a heated conversation for approximately five seconds until the defendant bent over, picked up the object, walked to the passenger side of the vehicle, and placed it in the vehicle's wheel well. He said he exited his vehicle, approached the defendant, instructed him to step away from the side of the truck, and retrieved the object which, upon examination, turned out to be a plastic bag containing five lithium batteries and a "crushed white substance" approximately the size of a burrito. At that point, he placed the defendant under arrest, read him his rights, and searched his person.

Investigator O'Dell testified that he found in the defendant's pockets a pill bottle without a prescription label containing thirteen pills, a pair of wire cutters, a flat-bladed stripping tool, a pair of latex gloves, and several paper towels. He said that the defendant claimed ownership of the pills in the bottle but said that the pills in the plastic bag belonged to Jody Emery. He stated that Glover, who was also arrested, made no statement to police officers at the scene and that nothing was found during the search of his person. However, a half-empty gallon jug of Coleman camp fuel was seized from the bed of his truck. Investigator O'Dell further testified that two women, Barbie Sharp and Angela Parrish, were inside the truck along with the defendant's young son.

Agent Dana Parmenter, a Tennessee Bureau of Investigation forensic scientist who analyzed the evidence in the case, testified that she determined that the crushed white substance consisted of 89.7 grams of a powder that contained ephedrine or pseudoephedrine, both of which were precursors for methamphetamine. She said that four of the tablets contained diazepam, the generic name for Valium, a Schedule IV controlled substance; and that a fifth tablet contained morphine, a Schedule II controlled substance. She did not analyze the other eight tablets.

Investigator Shawn Palmer of the Union City Police Department, an expert in the field of clandestine methamphetamine laboratories, testified that the most common method of methamphetamine manufacture in West Tennessee is the Anhydrous or "Nazi" method, in which the key ingredients are pseudoephedrine tablets, lithium metal, and anhydrous ammonia. He described the process:

> [A]fter you do the first process, when you mix anhydrous ammonia, lithium metal and your crushed tablets together, basically most people throw those in a jar, pour the Coleman fuel on top of it and let it set. A lot of people let it set for several hours, some let it set overnight.

Investigator Palmer testified that manufacturers of methamphetamine crush the tablets in order to speed the process of extracting ephedrine from the tablets, use wire cutters to remove lithium strips from lithium batteries, and wear latex or rubber gloves to protect their skin from the caustic chemicals involved in the manufacturing process. He said that the stripping tool could have been used "for anything," testifying that he had "seen people scrape old jars where they've cooked meth before, to get the meth back out of them." Based on his calculations, the total amount of ephedrine present in the crushed powder was in excess of nine grams, regardless of whether it was derived from 30-, 60-, 120-, or 240-milligram pseudoephedrine tablets. On cross-examination, Investigator Palmer acknowledged that the officers found no anhydrous ammonia at the scene and that nothing had been extracted from the crushed pseudoephedrine tablets.

The defendant testified that it was Glover who dropped the crushed pseudoephedrine pills onto the ground as the police approached his house. He said that when he glanced down and saw that the bag Glover had dropped contained a crushed white powder, he told him that he needed to pick it up. Glover refused to do so, however, telling him that "the stuff" belonged to Emery and that he did not "need this" because he had prior convictions. The defendant stated that he and Glover "had some words" over Glover's refusal to pick up the bag and that he finally picked it up himself and placed it in plain sight in Glover's truck because he assumed that he would be held responsible if the police officers found it on his property.

The defendant further testified that he had no pseudoephedrine on him that day, had a pair of pliers because he had been working on his car, and had the other tool, which he used to work on remote control airplanes, because he had been cutting open some boxes he had recently moved out of storage. He acknowledged that he and Glover had been at Emery's house the night prior to his arrest and that Glover and Emery had used methamphetamine at that time. He denied, however, that he had used any and said that methamphetamine was not his drug of choice. He also denied having asked Emery for anhydrous ammonia or having had any telephone conversation with him about cooking methamphetamine. Finally, he acknowledged that he had a prior conviction for misdemeanor theft.

Barbie Sharp, the mother of the defendant's two-year-old son, testified that she was sitting in the cab of Glover's truck with Angela Parrish when the officers arrived and that she overheard the defendant asking Glover what he had dropped. She next overheard Glover telling the defendant that it belonged to Emery and the defendant telling Glover to pick it up. She stated that the defendant later told her that he had picked up the bag himself because he panicked.

Wade Glover testified that he and the defendant "smoked dope" with Jody Emery and several other individuals at Emery's house the night before the incident. The next day, he gave the defendant a ride to the doctor and then took him, Sharp, and Angela Parrish to his father's house, where the defendant helped him load some items that his father wanted cleaned out of his machine shop. He said that the four stopped to pick up the defendant's older son, Ian, on their way back to the defendant's house and that he had dropped off the defendant and Ian and was preparing to go with the women to pick up the defendant's two-year-old son from day care when the police arrived.

Glover testified that as the police approached, he saw the defendant take something from his pocket and place it between the hood and windshield wipers of Glover's truck. He said that when he asked the defendant what he was doing and moved to the front of the truck, the defendant removed the object from the windshield and tried to place it under the truck but dropped it to the ground instead. Glover stated that he protested, telling the defendant not to put the object in his truck. The defendant, however, picked up the object and placed it under the truck just before the police reached them. Glover denied that he knew at the time what the object was but said he assumed from the defendant's furtive actions that it was something illegal. He stated that the camp fuel had not been in his truck earlier and that he had not known it was there. He assumed, however, that it was one of the items he and the defendant had cleaned out of his father's machine shop. According to his testimony, the defendant later told his father that Glover was not involved. Glover, like the defendant, acknowledged that he had a prior conviction for theft.

Marcus Neil Glover, Glover's father, confirmed that on the day of the incident his son and the defendant cleaned out his machine shop, where he had a large amount of accumulated junk, including old paint and camping supplies. Although he did not specifically recall having any Coleman camp fuel in his shop, he said that he had purchased it in the past and would not have thrown away any half-full containers. He also corroborated his son's testimony that, sometime after the defendant's arrest, the defendant told him that Glover "didn't have anything to do with this."

Investigator O'Dell, called as a rebuttal witness by the State, testified that Glover told him he knew the Coleman camp fuel was in his truck. He said Glover was unable, however, to provide an explanation for why it was there.

After deliberations, the jury convicted the defendant of all the indicted offenses with the exception of count one, in which it found him guilty of the lesser-included offense of facilitation of the initiation of a process intended to result in the manufacture of methamphetamine. They acquitted Glover of all indicted offenses with the exception of one of the counts of promotion of methamphetamine, finding him guilty on that count of the lesser-included offense of facilitation. At the conclusion of a November 16, 2007, sentencing hearing, the trial court sentenced the defendant as a Range II, multiple offender to an effective sentence of six years in the Department of Correction and entered the judgments in the case that same day.

On December 17, 2007, the defendant filed a *pro se* "Motion for Extension of Time for Filing for New Trial," followed by a January 11, 2008, *pro se* "Motion for New Trial." On January 18, 2008, the defendant's trial counsel filed a motion for new trial. The trial court orally denied the motion at the conclusion of a February 15, 2008 hearing and, on April 14, 2008, entered a written order to that effect. Trial counsel filed a notice of appeal on February 20, 2008. On July 30, 2008, the State filed a motion to dismiss the appeal on the basis that both the motion for new trial and notice of appeal were not timely. By order entered on August 27, 2008, this court granted the motion in part, ruling that the suppression issue was waived due to the untimely motion for new trial but that we would, in the interest of justice, waive the untimely notice of appeal because it appeared that "the failure to file a timely notice of appeal document was due to issues regarding representation after judgment had been entered." Consequently, the sole issue that we will consider in this appeal is the sufficiency of the convicting evidence.

## ANALYSIS

### Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence in support of his convictions for facilitation of a process intended to result in the manufacture of methamphetamine, promotion of the manufacture of methamphetamine, and unlawful drug paraphernalia use and activities. Specifically, he argues that the State failed to show that he possessed any methamphetamine precursors, that he or his codefendant crushed or facilitated the crushing of the ephedrine pills, or that he possessed "anything intended to introduce drugs into the body." The State responds that the evidence was sufficient to sustain the convictions, and we agree.

In considering this issue, we apply the rule that when sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

### A. Facilitation of the Initiation of Methamphetamine Manufacture

Tennessee Code Annotated section 39-17-435 provides in pertinent part that "[i]t is an offense for a person to knowingly initiate a process intended to result in the manufacture of any amount of methamphetamine." Tenn. Code Ann. § 39-17-435(a) (2006). The statute further provides that "'initiates' means to begin the extraction of an immediate methamphetamine precursor

-6-

from a commercial product, to begin the active modification of a commercial product for use in methamphetamine creation, or to heat or combine any substance or substances that can be used in methamphetamine creation." Id. § 39-17-435(c). A person facilitates a felony if, "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Id. § 39-11-403(a).

The defendant argues that the State failed to prove beyond a reasonable doubt that he "actually crushed the pills or . . . facilitated the crushing or knew anything about it when it was done." Viewed in the light most favorable to the State, however, the evidence established that on the night before his arrest, the defendant announced his intention of manufacturing methamphetamine and asked a drug-using acquaintance if he had any anhydrous ammonia. The following day, the defendant and his codefendant were caught on the defendant's property with crushed pseudoephedrine tablets, lithium batteries, and Coleman camp fuel, key ingredients used in the manufacture of methamphetamine. As the officers approached, the defendant picked up the plastic bag of crushed tablets and lithium batteries from the ground where it had just fallen and attempted to hide it in the wheel well of Glover's truck. When arrested, the defendant had wire cutters, a stripping tool, and latex gloves, all of which are tools regularly used by manufacturers of methamphetamine.

The State's methamphetamine expert testified that the steps involved in the Anhydrous method of methamphetamine manufacture are to crush pseudoephedrine tablets, mix the crushed powder with anhydrous ammonia and lithium strips removed from lithium batteries, pour Coleman camp fuel on top, and let the mixture sit for a few hours or overnight. From all this evidence, a rational jury could reasonably find the defendant guilty of facilitation of the initiation of a process intended to result in the manufacture of methamphetamine. We conclude, therefore, that the evidence is sufficient to sustain the conviction.

### B. Promotion of the Manufacture of Methamphetamine

Tennessee Code Annotated section 39-17-433, which makes it an offense for a person to promote methamphetamine manufacture, provides in pertinent part:

A person promotes methamphetamine manufacture who:

(1) Sells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use;

(2) Purchases or possesses more than nine (9) grams of an immediate methamphetamine precursor with the intent to manufacture methamphetamine or

deliver the precursor to another person whom they know intends to manufacture methamphetamine, or with reckless disregard of the person's intent[.]

Tenn. Code Ann. § 39-17-433(a)(1), (2) (2006). The defendant was convicted under both subsections 1 and 2 of the statute.

The defendant argues that the evidence is insufficient to sustain his promotion of methamphetamine convictions because the State failed to prove beyond a reasonable doubt that he possessed the crushed pseudoephedrine powder or anything else used in the production of methamphetamine. In support, he cites, among other things, the fact that the Coleman camp fuel was found in the back of Glover's truck and his testimony disavowing any prior knowledge of the bag of lithium batteries and crushed pseudoephedrine powder.

The evidence, however, established that the defendant attempted to hide a plastic bag containing crushed pseudoephedrine and lithium batteries in the wheel well of his codefendant's truck. According to the State's expert witness, the crushed powder contained at least nine grams of ephedrine, an immediate methamphetamine precursor. The evidence further established that a half-gallon of Coleman fuel was in the codefendant's truck and that the defendant had wire cutters, latex gloves, and a stripping tool on his person. This evidence was sufficient for the jury to find the defendant guilty of both counts of promotion of methamphetamine manufacture.

## C. Possession of Drug Paraphernalia

Finally, the defendant challenges his conviction for possession of drug paraphernalia, arguing that "there was no proof introduced that he actually possessed anything intended to introduce drugs into the body." However, as the State points out, the defendant's conviction was based on his possession with the intent to use drug paraphernalia *to manufacture a controlled substance*, as the count charging him with possession with the intent to use drug paraphernalia to introduce a controlled substance into the body was dismissed following the State's stipulation that the search of the defendant's residence was unlawful. The jury heard testimony about the defendant's possession of wire cutters, latex gloves, and a stripping tool and an explanation as to the use each item had in the Anhydrous method of methamphetamine manufacture. We conclude, therefore, that the evidence was sufficient for the jury to convict him of possession with the intent to use drug paraphernalia to manufacture a controlled substance.

## CONCLUSION

Based on our review, we conclude that the evidence was sufficient to sustain the defendant's convictions. Accordingly, the judgments of the trial court are affirmed.

_____
ALAN E. GLENN, JUDGE