IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 30, 2011

## STATE OF TENNESSEE v. WILLIE McLEOD

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 271794    Barry A. Steelman, Judge**

**No. E2010-02347-CCA-R3-CD - Filed September 6, 2011**

The defendant, Willie McLeod, was convicted by a Hamilton County Criminal Court jury of attempted aggravated assault, a Class D felony; disorderly conduct, a Class C misdemeanor; and resisting arrest, a Class B misdemeanor. He was sentenced to an effective term of twelve years in the Department of Correction as a career offender. On appeal, the defendant challenges the sufficiency of the convicting evidence. After review, we affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

John G. McDougal, Chattanooga, Tennessee, for the appellant, Willie McLeod.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; William H. Cox, District Attorney General; and Boyd M. Patterson, Jr. and Steven E. Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The defendant was indicted on two counts of aggravated assault with a deadly weapon against Anthony Simmons and his wife, Jamie Simmons, one count of disorderly conduct, one count of resisting arrest, and one count of retaliation for past action,[1] arising out of his encounter with the Simmonses outside a restaurant while apparently trying to

_____

[1] The charge of retaliation for past action was handled separately from the other charges.

panhandle from them.

## State's Proof

At trial, Anthony Simmons testified that on February 6, 2009, he and his wife had dinner at a restaurant in downtown Chattanooga around 7:30 p.m. After finishing dinner, they exited and walked down the stairs outside the restaurant. At the bottom of the stairs, they were approached by the defendant, who said, "'Let me get 35 cents.'" The defendant's tone of voice alarmed Mr. Simmons because "[h]e didn't seem like he was asking. It was more of a demand." When Mr. Simmons refused, the defendant "got . . . a really hateful, disgruntled look on his face[.]" The defendant was standing approximately two or three feet away from Mr. Simmons at the time. Mr. Simmons told the defendant, "'Move out of our way,'" because the defendant was blocking their path, and the defendant "got extremely upset."

Mr. Simmons testified that the defendant took off one of the two jackets he was wearing and began "waving his fists around. He had backed up . . . a little bit but he was just jumping back and forth, waving his fists around." The defendant also began threatening Mr. Simmons, saying "he was going to kick [Mr. Simmons'] ass." Mr. Simmons noticed that the defendant had something in his hand that "looked like a box cutter blade." Mr. Simmons recalled that the defendant "start[ed] saying he's going to kill us because I killed his ancestors[.]" The defendant also claimed to have a gun and threatened to shoot Mr. Simmons and his wife. According to Mr. Simmons, the defendant "said he was going to kill me, several times, and . . . he included my wife I know at least once."

Mr. Simmons testified that they found an opportunity to get around the defendant and began walking up Second Street away from him as Mrs. Simmons called 911. When the Simmonses were about thirty yards away from the defendant, the defendant started following them up the sidewalk. Concerned because the area where they had parked was particularly dark, Mr. Simmons pulled out his pocketknife and yelled to the defendant that they were not going any further and that the defendant needed to leave them alone. Mr. Simmons took the phone from his wife and began relaying their location to the authorities. At that point, the defendant turned around and headed away from them. Mr. Simmons followed the defendant from a distance to relay his location to the police. The police apprehended the defendant, and the Simmonses identified him. Mr. Simmons denied calling the defendant a racially derogatory name.

On cross-examination, Mr. Simmons denied having any alcoholic beverages that evening. He clarified that the defendant was six to eight feet from them when the defendant got upset and he saw the blade in the defendant's hand. Mr. Simmons acknowledged that

the defendant never lunged at them with the blade, although he did wave the blade around while threatening them. On redirect examination, Mr. Simmons stated that the defendant appeared to have the present ability to attack them with whatever kind of blade he had.

Jamie Simmons testified she and her husband went down the stairs from the restaurant "and all of a sudden the defendant appeared . . . in the corner." The defendant said to them, "'Let me get 35 cents.'" The defendant had a jacket and a white garbage bag in his hand. She recalled that Mr. Simmons told the defendant, "[N]o," and the defendant "got a very irritated, angry look on his face . . . and started kind of jumping side to side, and . . . at some point while he was moving around, he produced a blade[.]" The defendant threatened to kill them and accused them of "kill[ing] his ancestors." She said that the defendant was "[f]ar too close for comfort" and was "[d]efinitely [in her] personal space." He was close enough that he could have cut them with the blade "[i]f he had wanted to." The defendant also claimed to have a gun, although Mrs. Simmons never saw one. Mrs. Simmons said she "was very scared."

Mrs. Simmons testified that the defendant "backed off a little bit," so they were able to get around him and "started going up the hill[.]" The defendant started to follow them up the hill. Mrs. Simmons recalled that, at that point, Mr. Simmons stopped and told the defendant that "[they] weren't going any farther" because he did not want to continue into the secluded area ahead. Meanwhile, Mrs. Simmons called 911 and tried to relay their location to the authorities. The defendant turned around and started going the other way upon hearing that the police were coming, but the Simmonses kept him in their sight until the police arrived and arrested him. On cross-examination, Mrs. Simmons said that Mr. Simmons never used a racial epithet toward the defendant.

Officer Robert Simmons[2] of the Chattanooga Police Department testified that at approximately 8:44 p.m. on February 6, 2009, he "was called to an assault or a robbery in progress at the 200 block of Market Street." He was advised that the suspect was armed with a blade. Upon locating someone matching the defendant's description, Officer Simmons approached and ordered that he put his hands on the patrol car. Officer Simmons patted the defendant down and detained him for the victims to make an identification. The victims "immediately identified the defendant as the person who had assaulted them."

Officer Simmons learned that a small razor was involved in the offense, so he searched the defendant again. As he reached into the defendant's front left pants pocket, he felt what appeared to be a razor blade and the defendant "pulled away . . . while [the officer's] hand was halfway in there." Officer Simmons and another officer on the scene

---

[2] Officer Simmons is of no relation to Mr. and Mrs. Simmons.

"held [the defendant] against the car and secured him while he was pulling and yelling and screaming at [them] until [they] got the razor out." At that point, Officer Simmons handcuffed the defendant and informed him that he was under arrest. The defendant continued making a commotion and resisted getting into the patrol car until the officers were finally successful in securing him. Officer Simmons stated that in addition to the razor blade, a crack pipe was recovered on the defendant.

### Defendant's Proof

The defendant testified that he was fifty years old and from Dothan, Alabama. At the time of the offense, he had been living in Chattanooga for approximately three or four weeks and was homeless and unemployed. He did "a little day labor" and panhandled to get money. The defendant stated that on the night in question, he approached the Simmonses and said, "'Brother, do you got 35 cent[s] you can spare me?'" He denied asking for money in the tone alleged by the Simmonses. The defendant recalled that Mr. Simmons responded, "'[G]et your ass on down that . . . street[,]'" and "call[ed] [him] the N word[.]" The defendant admitted that, after Mr. Simmons' racial epithet, "[they] went to battling with words." However, the defendant denied ever approaching within three or six feet of the Simmonses or approaching in "a violent way."

The defendant said that he saw that Mr. Simmons had a knife and then Mrs. Simmons got between him and Mr. Simmons to stop Mr. Simmons from coming toward the defendant. The defendant denied ever pulling out a razor blade, claiming that he had forgotten he had it in his pocket after he "had been smoking crack all that day." The defendant admitted that he argued with Mr. Simmons. He claimed that after the confrontation, he "calmly walked on down the streets[.]" The defendant denied threatening to kill the officer who arrested him or that officer's family.

### Rebuttal Proof

Officer Simmons testified that en route to the jail, the defendant began threatening the officer and his family, stating that he knew where they lived and was going to kill them. The defendant continued the threats at the jail during the booking process. The defendant made the threats approximately three or four times in all.

Gene Coppinger testified that he worked as a security supervisor for the Hamilton County Sheriff's Department. Coppinger said that the cameras in the booking area of the jail had no audio recording capability.

David Denny, an assistant district attorney assigned to the Hamilton County General Sessions Court, testified that the general sessions court had recently experienced some technical difficulties in recording and preserving preliminary hearing testimony.

After the conclusion of the proof, the jury found the defendant guilty of the lesser-included offense of the attempted aggravated assault of Anthony Simmons, not guilty of aggravated assault against Jamie Simmons, and guilty of disorderly conduct and resisting arrest.

## ANALYSIS

The defendant challenges his conviction for the attempted aggravated assault of Mr. Simmons, arguing that he did not draw the razor blade until the Simmonses were thirty to forty yards away – a distance from which he could not have reasonably assaulted Mr. Simmons.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, an aggravated assault is committed when a person intentionally or knowingly commits an assault as defined in section 39-13-101 and uses or displays a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(B). A person commits an assault who intentionally or knowingly causes another to reasonably fear imminent bodily injury. Id. § 39-13-101(a)(2). A person commits criminal attempt when "acting with the kind of culpability otherwise required for the offense[,] [he or she] [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Id. § 39-12-101(a)(2).

Mr. Simmons testified that the defendant was two or three feet away when he initially approached them and six to eight feet away when he got upset and Mr. Simmons saw the blade in the defendant's hand. Mr. Simmons also testified that the defendant threatened to kill him several times. He observed that the defendant had the present ability to attack them with whatever kind of blade he had. Mrs. Simmons testified that the defendant "produced a blade" and threatened to kill them. Although she could not determine how close the defendant was to them during the encounter, Mrs. Simmons recalled that he was "[f]ar too close for comfort" and was "[d]efinitely [in her] personal space." She elaborated that the defendant was close enough that he could have cut them with the blade "[i]f he had wanted to." Officer Simmons testified that he recovered a razor blade from the defendant's front pants pocket. Although the defendant denied pulling a blade on the Simmonses and threatening to kill them, the jury accredited the Simmonses' testimony over that of the defendant, as was its province. In the light most favorable to the State, we conclude that there was sufficient evidence for a rational trier of fact to convict the defendant of attempted aggravated assault. The defendant's contention (and reliance on) that he did not draw his razor blade until he was thirty to forty yards away from the Simmonses is a misstatement of the record as the record reflects that the "thirty to forty yards" was from Mr. Simmons' testimony about his distance from the defendant when he withdrew his personal pocketknife.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the

trial court.

_____

ALAN E. GLENN, JUDGE