WILLIAM D. CARROLL, JR.

*v.*

STATE OF TENNESSEE

370 S. W. 2d 523.

(*Nashville,* December Term, 1962.)

Opinion filed September 11, 1963.

HUGH STANTON, Public Defender, Memphis, ELIOT J. GLESZER, Memphis, of counsel, for plaintiff in error.

GEORGE F. McCANLESS, Attorney General, WALKER T. TIPTON, Assistant Attorney General, Nashville, for defendant in error.

MR. JUSTICE FELTS delivered the opinion of the Court.

Plaintiff in error, referred to as defendant, was indicted and charged with rape of Dolly Carroll. The jury found him guilty as charged and fixed his punishment at death by electrocution. The Trial Judge approved the jury's verdict and entered judgment accordingly.

Defendant brought the case to this Court by an appeal in the nature of a writ of error and has assigned errors, challenging the sufficiency of the evidence to sustain the conviction and seeking a reversal and a new trial upon a number of other grounds.

Evidence for the State was that Dolly Carroll (not related to defendant) was a housewife 17 years of age. She, her husband (L. E. Carroll), 18 years of age, and their one-year-old child lived in an apartment in a housing project on Thomas Street in Hurt Village in Memphis, Tennessee. There were six apartments numbered consecutively from 621-A through 621-F, their apartment being 621-D, which had a kitchen and living room downstairs and two bedrooms and a bathroom upstairs.

In the nighttime, about 3:15 A.M., September 8, 1961, while Dolly Carroll and her husband were asleep in one bedroom, and their baby in another, defendant broke and entered their apartment. He cut the screen, raised the kitchen window, and went upstairs into their bedroom. He turned on the light, she awoke, and saw him crouching beside their bed with the knife in his hand. She asked

him who he was and what he was doing there. He put the knife to her throat and told her to be quiet.

Her husband awoke and defendant put the knife to his throat and asked him if he had any money; he replied he had fifty cents. Defendant said: ''Don't get smart with me, punk,'' and struck him in the face. He got up and tried to get defendant to leave. Acting as if he were going to leave, defendant threw a $10.00 bill on the bed, said, ''This is for breaking into your house,'' and apparently started out, the husband walking with him toward the stairs. As they started down the steps, defendant struck him on the head and ''knocked him out.''

Hearing the ''thud,'' Dolly Carroll ran to the top of the steps, saw her husband lying on the steps, ''bleeding all over his face.'' Defendant dragged him into their bedroom and laid him on the floor near the bed. Ripping open Mrs. Carroll's blouse, defendant held the knife to her throat, told her to take her clothes off, and get in the bed with him, that if she refused, he would kill her. Through fear, she submitted, and he first had unnatural sexual relations with her—put his mouth to the vagina and held it there for some time.

He then forced her to have sexual intercourse with him in the natural way, and while he was engaged in the act, her husband, lying on the floor, moved as if he might be about ''to come to,'' or regain consciousness; and defendant got up, and struck him another disabling blow, left him on the floor, got back in bed with Mrs. Carroll, and, forcibly and against her will, completed the sexual act—raped her.

Defendant then carried her husband into the bathroom, washed the blood off his face, walked down the stairs,

and left the apartment. As he did so, he told Mrs. Carroll not to cry out or call the police, or he would come back. As soon as he had gone she got her baby, went about a half a block to the home of her mother, who called the Memphis police. When they arrived, her mother went in an ambulance with the husband to the hospital, and these officers went with Mrs. Carroll to the apartment to observe appearances there.

These officers testified that though "not hysterical," she "had been crying," and was "upset" and "nervous," but "rational." She told two of them, Lieutenant Smith and Officer Beech, that she had been "criminally assaulted"; that the intruder threatened her with a knife, forced her to have sexual relations with him both ways—first in an unnatural way and then by raping her; and she found and gave the officers the knife the intruder had used—a black-handled steak knife—which was put in evidence and sent up. Lieutenant Smith, in his cross-examination said:

"A. Then, she said the intruder made her have unnatural relations and then was in the act of having normal relations with her and her husband apparently was coming to again and he got up and hit him again and then had the relations with her.

"Q. In other words, he had unnatural relations with her and then started having natural relations with her and during the course of that the husband aroused and he got up and cracked him again and then went back and finished the act?

"A. Finished the act, yes sir."

Lieutenant Smith saw the ripped window screen and mud and dirt on the window sill where defendant had

entered, and saw splotches of blood on the stairs and on the sheet on Mrs. Carroll's bed. He also testified that there was mud and dirt on the sheet at the foot of the bed. This sheet was put in evidence as an exhibit, and sent up with the record. Also, a photograph showing the blood splotches on the stairs was introduced and sent up as an exhibit.

As these officers were examining this screen in Mrs. Carroll's apartment (621-D), they also noticed that the screen had been cut in Apartment 621-F. On leaving Mrs. Carroll's apartment, defendant had walked down two doors, passing by Apartment 621-E, to Apartment 621-F, and cut the kitchen window screen, raised the window, and entered Apartment 621-F, which was occupied by Mrs. Edna Sneed and her three small children. Her testimony as to this was admitted over defendant's objection.

She said that she was asleep on a couch downstairs and her children upstairs; that she was awakened when defendant turned on her light, and he asked her: "Do you want to make love to me?"; that when she said: "No," he put a knife to her throat, made her take her clothes off, and engaged in sexual perversion with him (put her mouth on his penis), and then was about to force her to have sexual intercourse with him, when the officers knocked on her door, she dressed, let them in, and they arrested him.

Defendant denied that he raped Mrs. Carroll—said he never touched her; but he admitted breaking into her apartment, assaulting her husband, and breaking into Mrs. Sneed's apartment. He denied the sexual perversion charged by Mrs. Sneed, but admitted he was about to have sexual intercourse with her, when the officers

came in, but said it was with her consent. He claimed he broke into both of these apartments by mistake, thinking each was 621-E, where his wife had lived; and that he did this to get his "clothes" which he said he thought were there.

He said he escaped from a prison camp in California, hitchhiked to Memphis, arrived there in the afternoon of September 7, 1961; and that he did this because he wanted to see his wife, Jean Carroll. He had been released from the Shelby County workhouse in August 1960, and he and his family had gone to California, where he was soon arrested on a charge of burglary. His wife and children returned to Memphis, he was convicted of this charge, and sentenced to serve a year, and had served all of that time but 51 days when he escaped.

His wife had lived for a while in Apartment 621-E, but in July or August 1961, had moved out of it and gone to live with her sister, Mrs. Wilcoxson, in Frayser, a town in Shelby County. Defendant testified that soon after his arrival in Memphis on September 7, 1961, he called his sister-in-law, Mrs. Ruth Hammers, on the telephone, told her he had got back to Memphis, and asked her where his wife Jean was; that Mrs. Hammers told him she was at the home of Mrs. Wilcoxson in Frayser; and that he then telephoned Jean, but she refused to see him and told him she was going to divorce him.

He said that this so upset him that he decided to go to Florida next day; that, in pursuance of this plan, later that night, he broke into both of these two apartments under the mistaken belief that each was the one where his wife lived and where his clothes and personal effects were; and that he did this without any criminal intent,

innocently, and only to get these things to go to Florida next day.

On rebuttal, Mrs. Ruth Hammers, called as a witness for the State, testified that on the afternoon of September 7, 1961, defendant called her at her home on the telephone, said he had just got back to Memphis, and wanted to see his wife Jean; that he had gone by the apartment where Jean had been living and ''she wasn't there''; and he asked Mrs. Hammers where she was. Mrs. Hammers told him she had moved from that apartment and was living in the home of Mrs. Wilcoxson in Frayser.

For defendant, it is earnestly urged that the evidence does not sustain the verdict; that the charge of rape rests entirely upon the uncorroborated testimony of the prosecutrix Mrs. Carroll; that the credibility of her and Mrs. Sneed is open to grave doubt; and that we should disbelieve their testimony and believe defendant's denial of the charge and his explanation of his presence in the apartments on the night in question.

This argument overlooks the legal effect of the verdict of the jury, and also the law governing appellate review. The jury and the Trial Judge saw the witnesses face to face, heard them testify, and observed their demeanor on the stand, and were in much better position than we are, to determine the weight to be given their testimony. The ''human atmosphere of the trial and the totality of the evidence'' before the court below cannot be reproduced in an appellate court, which sees only the written record (*Powell v. Streatham Manor Nursing Home,* (1935) A.C. 243, 257, 267). *Folk v. Folk,* 210 Tenn. 367, 355 S.W.2d 634, 637.

■ On appeal, therefore, the jury's verdict is to be taken as establishing the truth of the case. In civil cases the verdict will not be disturbed on the facts if it is supported by any material evidence. In criminal cases, out of tenderness to human life or liberty, the rule is more lenient: The verdict will be disturbed on the facts only if the evidence clearly preponderates against it and in favor of the innocence of the accused. *Cooper v. State,* 123 Tenn. 37, 56, 153, 138 S.W. 826.

■ As said so often by this Court, the jury's verdict of guilt, approved by the Trial Judge, establishes the credibility of the witnesses supporting the verdict, displaces the presumption of innocence that attended defendant on the trial, raises a presumption of his guilt, and puts on him the onus of showing on appeal that the evidence preponderates against the verdict and in favor of his innocence. *Cooper v. State,* supra, 123 Tenn. 37, 56-61, 153, 138 S.W. 826; *Turner v. State,* 188 Tenn. 312, 322, 219 S.W.2d 188; *Batey v. State,* 191 Tenn. 592, 596, 235 S.W.2d 591, 593; *Ivy v. State,* 197 Tenn. 650, 652, 277 S.W.2d 363; *Anderson v. State,* 207 Tenn. 486, 341 S.W. 2d 385.

■ So, under the law by which we are bound, we may review the evidence only to determine whether it preponderates against the verdict and in favor of the innocence of defendant; and in such review we must take the verdict as having established the credibility of the State's witnesses. So taken, their testimony fully proves defendant guilty as charged. It shows that in the middle of the night while Mr. and Mrs. Carroll were asleep, defendant broke into their home, knocked the husband unconscious, and raped the wife by force and fear exerted upon her.

■ It is true Mrs. Carroll was the only direct witness to the fact of rape, but we do not think her testimony was uncorroborated. Though the law does not require that the injured female be corroborated in rape cases (*King v. State,* 210 Tenn. 150, 357 S.W.2d 42, 45-46), as does our statute in cases of violation of the age of consent (T.C.A. sec. 39-3706), it does, of course, require that a charge of rape be fully made out by proof clear and sufficient to satisfy the jury's mind of defendant's guilt beyond a reasonable doubt.

Mrs. Carroll testified clearly and unequivocally that, through fear induced by his threats, defendant forced her to submit; and that he had sexual intercourse with her—completed the sexual act, forcibly and against her will; and her testimony as to the fact of rape was corroborated by a number of circumstances developed in the proof.

Such corroboration was afforded by the fact that defendant broke into their apartment, entered their bedroom, assaulted and disabled the husband to resist; by spots of blood on the sheet on her bed; by the mud and dirt on the sheet similar to that found on the window where defendant entered; by her condition and appearance when the officers saw her soon afterwards; by the testimony of Mrs. Sneed as to defendant's breaking into her apartment and attempting to rape her; by abrasions found by the doctor on Mrs. Carroll's skin at the entrance of the vagina; and by her statements to the police that she had been criminally assaulted.

■ It has long been the settled rule in this State that where the injured female is examined as a witness, on a trial of a charge of rape, her statements of the circumstances or particulars of the complaint made soon after

the commission of the offense, are admissible as corroborative or confirmatory of her credibility. *Phillips v. State,* 28 Tenn. 246; *Curtis v. State,* 167 Tenn. 430, 433, 70 S.W. 2d 364; *King v. State,* supra.

It is true that Mrs. Carroll, three or four hours after the rape, was examined at the hospital by Dr. Robert C. Ford, Jr., who said he found no male sperm in the tests he made of smears of material taken by him from inside the vagina; but he said this fact did not show she had not been raped, because such sperms may be expelled in various ways, as by urinating, washing, etc. Mrs. Carroll said that she washed and attempted to clean herself just after the rape.

Defendant admitted most of the circumstances except the rape itself, admitted he broke into the apartment of the Carrolls, disabled the husband by assault, and admitted he broke into Mrs. Sneed's apartment and was about to have sexual relations with her, when the police came, but claimed this was with her consent. His story was that he broke and entered both of these apartments (621-D and 621-F) by mistake, thinking each was the apartment (621-E) where his wife had lived; and that he did all these things innocently and without criminal intent, but only to get his clothes and personal effects which he thought were still there.

This story, in the light of all the circumstances, seems so unreasonable that the jury could well disbelieve it, as their verdict indicates they did. Defendant had lived in the Hurt Village and was familiar with these apartments, which were plainly numbered and lettered on the outside. It is difficult to imagine that he could make the mistake

of breaking into the wrong apartment once, but it seems altogether incredible that he could do so twice.

And if he thought his clothes and personal effects were still in the apartment (621-E) which his wife had vacated, and if he had no criminal intent, but merely wanted to get these things, why did he not go there for them in the daytime? Why did he go in the darkness of night, commit these burglaries, or break and enter, not that apartment, but both the adjoining ones, and assault the occupants?

Moreover, his claim that he thought his clothes and effects were still in that apartment seems utterly unreasonable in the light of the testimony of Mrs. Ruth Hammers. She told him the afternoon before the crime that his wife had moved out of that apartment *several weeks before,* and was living in the home of her sister, Mrs. Wilcoxson. He admitted Mrs. Hammers told him where his wife was and admitted calling his wife that afternoon; and he said she refused to see him and told him she was going to divorce him.

Mindful of the gravity of this charge, and of the penalty imposed, we have fully and carefully considered all the evidence; and upon such consideration are forced to the conclusion that the defendant, though most ably represented by his learned counsel, has failed to carry the burden of showing that the evidence preponderates against the verdict and in favor of his innocence; and that this record leaves no doubt of his guilt of the crime charged.

Defendant assigns error upon the admission of the testimony of Mrs. Edna Sneed "as to the facts and things that went on in her apartment, wherein she alleged that the defendant made a criminal assault on her." It is

urged that this was evidence of other and independent crimes which did not elucidate or tend to prove defendant's guilt of the charge upon trial, and was, therefore, inadmissible and highly prejudicial to him.

We have many cases in which we have discussed the question of the admissibility of evidence of other crimes than that for which the accused is on trial. We need not undertake to review them. Some of the more recent ones are: *Sims v. State,* 208 Tenn. 615, 348 S.W.2d 293; *Jones v. State,* 200 Tenn. 553, 292 S.W.2d 767; *Harris v. State,* 189 Tenn. 635, 227 S.W.2d 8; *Woodruff v. State,* 164 Tenn. 530, 51 S.W.2d 843; *Mays v. State,* 145 Tenn. 118, 238 S.W. 1096.

The general principle to be collected from these, and other authorities, is that evidence of another crime or crimes than that charged in the indictment and for which defendant is on trial, is not admissible unless such evidence is relevant to prove his guilt of that crime. The test of relevancy is furnished not by law, but by logic and general experience (Thayer, Preliminary Treatise on Evidence (1898), 264-266). Morgan, Basic Problems of Evidence (1961), 183-194; Trautman, Logical or Legal Relevancy—A Conflict in Theory, 5 Vand.L.Rev. 385, 403-410.

It is generally agreed that evidence of other crimes by defendant is not admissible merely to prove his disposition to commit such a crime as that on trial; but such evidence is admissible when it is relevant to prove some other material issue on trial; for instance, when it tends to establish (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme or plan for commission of two or more crimes so related to each other

that proof of one tends to establish the others; and (5) the identity of defendant on trial. Morgan, supra; *Harris v. State,* supra; *Woodruff v. State,* supra.

The question of the admissibility of evidence of other crimes to prove defendant's guilt of the crime on trial underwent elaborate consideration in *Mays v. State,* supra. There, the Court said:

"Evidence which is relevant to defendant's guilt is not inadmissible because it proves or tends to prove him guilty of another and distinct crime. It frequently happens that two distinct offenses are so inseparably connected that the proof of one necessarily involves proving the other, and in such a case on a prosecution for one evidence proving it cannot be excluded because it also proves the other. Evidence of another and distinct crime is admissible if it was committed as a part of the same transaction and forms part of the *res gestae.*

\* \* \* \* \* \*

"It is also admissible, where the crime charge is a part of a plan or system of criminal action, to offer evidence of other crimes near to it in time and of similar character, to show the knowledge and intent of the accused, and that the crime with which he is charged was not the result of accident or inadvertence."

■ We think the Trial Judge properly admitted in evidence the testimony of the witness Mrs. Sneed as to the circumstances of defendant's breaking and entering her apartment, his threats of her with the knife, his forcing her to engage in sexual perversion with him, his criminal assault on her with intent to force her to have sexual intercourse with him, and his arrest by the police in her apartment. These circumstances were admissible

and relevant as tending to prove defendant's guilt of the crime specified in the indictment and for which he was on trial.

As above stated, the State's proof was that defendant broke and entered Mrs. Carroll's apartment, assaulted and disabled her husband, threatened her with a knife, forced her to engage in sexual perversion with him, and then raped her; and that on leaving her apartment (621-D), passing one (621-E), he broke into the next one (621-F), apparently without leaving the premises, and by using the same pattern of procedure in both against each of the women assaulted.

We think the facts detailed by Mrs. Sneed were so connected with those of the crime on trial as to be part of one and the same transaction, that both were so related in time and circumstances that proof of one tended to elucidate and establish the other, and that upon this ground the testimony of Mrs. Sneed was admissible. *Defrese v. State,* 50 Tenn. 53; *Woodruff v. State,* supra; *Jones v. State,* supra; *Sims v. State,* supra.

We also think such testimony admissible upon the further ground that it tended to establish defendant's motive and criminal intent, and to show the absence of mistake or accident, as claimed by him in breaking and entering both apartments. His defense was largely based upon this claim of accident or mistake in entering the apartments; and Mrs. Sneed's testimony was relevant as tending to negative this claim and to prove his guilt of the crime on trial. *Thompson v. State,* 171 Tenn. 156, 101 S.W.2d 467; *Mays v. State,* supra, 145 Tenn. 142, 238 S.W. 1103; Morgan, supra, Basic Problems of Evidence (1961), 214.

The admissibility of her testimony might well be rested upon even another ground: that it tended to prove a pattern of sexual perversion similiar to that accompanying the crime on trial. As pointed out by Professor Morgan, "in cases involving so-called sex crimes, particularly abnormal sexual practices, there is a modern tendency to admit evidence of disposition and, as proof of disposition, evidence of other offenses of the same kind" (Basic Problems of Evidence (1961), p. 214). Trautman, supra, 5 Vand.L.Rev. 406, note 84.

 Defendant assigns error upon the Trial Judge's refusal to grant two special requests for additional instructions to the jury. Such requests were as follows:

"The conduct of the victim of an assault to rape immediately or shortly after the attack, that is as to outcry or show of emotion to those first contacted after the attack upon the victim is a matter that bears on the credibility and the truthfulness of the charge made by the victim."

"Silence by the victim of an assault to rape, or her failure to make an outcry is a matter which bears on the truthfulness of the complaint of the victim."

We think there was no evidence as to any failure of outcry or show of emotion by Mrs. Carroll. As soon as defendant left, she took her baby to the home of her Mother, and had the police called. Four or five of the officers came, investigated the complaint, and arrested defendant. Two or three of them talked to her.

It appears she was "nervous and frightened," and "had been crying," and did not tell Officer Pitts she had been assaulted. But she told two of the other officers,

Lieutenant Smith and Officer Beech, she had been criminally assaulted, and that the intruder had forced her to have sexual relations with him in both ways—unnaturally and by raping her.

So, it can hardly be said there was any factual or evidential basis calling for any such instructions to the jury as those embodied in these two special requests. But, evidently to give defendant the benefit of the doubt, the Trial Judge, in his general charge, gave the jury an instruction which substantially covered the same matter as these special requests. It was, therefore, not error to refuse such requests.

██ It is assigned for error that the Judge declined, at the beginning of the trial, to allow defendant's counsel to make a statement of his theory of defense. In asking such permission, counsel recognized that, while such was the practice in some states, it was not the practice in this State (Tr. pp. 21-22). The Trial Judge followed the established procedure in this State. Gilreath's Caruthers History of a Lawsuit (7th ed.), secs. 740-741, pp. 859, 861. It is not pointed out how this prejudiced the defense.

Finally, it is contended that the verdict indicates passion, prejudice and caprice on the part of the jury; and that the penalty of death in this case is too severe, and the punishment should be reduced or the judgment reversed and a new trial granted.

██ Rape is one of the highest crimes against civilized society; and the statute (T.C.A. sec. 39-3702) declares that whoever is convicted of rape "shall suffer death by electrocution," but provides the jury may, if they think proper, commute the punishment to imprisonment for life, or for any period not less than ten (10)

years. The matter "rests in the sound discretion of the jury upon the evidence and under the law as given them in the charge by the court" (*Temple v. State,* 127 Tenn. 429, 435, 155 S.W. 388, 390).

██ ██ According to the proof, the rape in this case was accompanied by the most aggravated circumstances —burglary, violence, assault, and threats of death. The punishment imposed, though severe, was authorized by law. Where the punishment imposed by the jury was within the limits allowed by the law, it cannot be said that their verdict indicated passion, prejudice or caprice upon their part. *Edwards v. State,* 202 Tenn. 393, 401, 304 S.W.2d 500; *Ryall v. State,* 204 Tenn. 422, 425, 321 S.W.2d 809.

This disposes of all the matters raised by the assignments of error. We find no merit in any of such assignments and all of them are overruled. The judgment of the Criminal Court of Shelby County is affirmed. Defendant will be committed to the Warden of the State Penitentiary and executed as the law directs on Friday, November 15, 1963.