# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 4, 2011

## STATE OF TENNESSEE v. ANTONIO TURNER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-05732     W. Mark Ward, Judge**

**No. W2010-02423-CCA-R3-CD  - Filed January 11, 2012**

The defendant, Antonio Turner, was convicted by a Shelby County jury of attempted first degree murder, especially aggravated kidnapping, and especially aggravated robbery, all Class A felonies, and was sentenced by the trial court as a Range I offender to concurrent terms of twenty-five years in the Department of Correction for each conviction.  The sole issue he raises on appeal is whether the evidence was sufficient to sustain his convictions. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Stephen C. Bush, District Public Defender; Barry W. Kuhn (on appeal) and Constance Barnes (at trial), Assistant Public Defenders, for the appellant, Antonio Turner.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Fleming and Ray Lepone, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

At approximately 11:45 p.m. on January 22, 2008, the victim, Brandon Noe, was driving home from work in his green Chevrolet HHR when four men in a blue Honda Civic pulled beside him as he was stopped at a stop sign in Southaven, Mississippi.  Noe had his driver's window open because he was smoking, and the Honda's front seat passenger began to ask him for directions.  Almost immediately, however, that man and the one sitting behind

him, who were both armed with pistols, jumped from the Honda, forced Noe at gunpoint from his vehicle, and demanded money. They then wrapped an item of clothing around Noe's head, placed him in the backseat of his vehicle, and drove him to an empty Memphis field, where they shot him in the back and left him for dead. The defendant was arrested early the next morning after using Noe's credit card to purchase gasoline for his girlfriend's vehicle. He was subsequently indicted with Montez Duncan, Anthony Hall, and Christopher Taylor for the especially aggravated robbery, especially aggravated kidnapping, and attempted first degree murder of the victim. His case was later severed, and he proceeded to trial alone before a Shelby County jury in March 2010.

At trial, the victim testified that he was at the stop sign when he noticed a small, blue, four-door car with four men inside approaching him rapidly from behind. The vehicle pulled up beside him, and the front seat passenger began to ask for directions. "[A]lmost immediately," both that man and the one who was riding on the passenger side in the backseat of the vehicle jumped from their car and approached him. Both men were armed with pistols, and one of them placed a gun to his head, reached in his car, turned the ignition off, and then opened the door and forced him to get out.

The victim testified that the men demanded money but that he had no cash and instead offered them his credit card. While one man held him at gunpoint, the other man rummaged through his vehicle, finding an article of clothing which the men wrapped around his head. The men then forced him into the backseat of the vehicle, where one sat beside him holding a gun to his head while the other one drove his vehicle.

The victim testified that he pleaded with the men for his life during the fifteen- to twenty-minute drive that followed. Sometime during that ride, his cell phone began ringing and one of the men took it from him. When the car finally stopped, someone opened the door, took him out of the vehicle, and walked him a short distance across a grassy area before shooting him at point blank range in the back. The victim said he regained consciousness to find himself alone in a field. Unable to walk because he lacked feeling in his right leg, he crawled on his stomach through the field, across a street, over a drainage ditch, and through some boards into the backyard of a house. He then crawled around to the front of the house, where he managed to rouse the residents, who summoned help.

The victim testified that he was hospitalized for three days as a result of his injury, which consisted of a gunshot wound to the back that broke two of his vertebra and caused permanent nerve damage. He said he underwent physical therapy for four or five months, where he gradually learned to walk without the aid of a walker or crutches. He still lacked feeling in his leg, and the bullet, which his physicians had deemed too risky to remove, was still lodged in his spine.

The victim identified his credit card, bank card, and various forms of identification, which had been taken during the robbery. He also identified his credit card statement, which showed a January 23, 2008 charge of $80.25 at a Memphis Amoco service station, as well as his cell phone bill, which showed several phone calls placed after his kidnapping. On cross-examination, the victim acknowledged that he was unable to identify the defendant as one of the four men he saw in the Honda Civic.

Nineteen-year-old Shanikquia Sawyer, who identified the defendant as the cousin of Anthony Hall, or "A.J.," whom she had dated, testified that Hall telephoned her two times early on the morning of January 23, 2008. She did not answer his initial call because it was from a restricted number, but she then received a call from Valerie Jackson, or "Little Val," which caused her to answer Hall's second call. After she spoke with Hall, he picked up her and her sister at her house. Hall was driving a green car, which Sawyer later identified as the victim's Chevrolet HHR. She said that the defendant, who was accompanied by Valerie Jackson, trailed behind Hall driving a blue car, which she later identified as the Honda Civic. To her knowledge, neither the defendant nor Hall owned a vehicle, and she had never seen either car before that night.

Sawyer testified that Hall first dropped her sister off at her father's house and then drove to where Valerie Jackson's red car was parked, still trailed by the defendant and Jackson. Jackson got into her red car, and the group, traveling in their three separate vehicles, drove to a Shell gas station on the corner of Bellevue and South Parkway, where Jackson pulled up to the pump while Hall and the defendant parked their respective vehicles on the side. The defendant got out of the Honda and swiped a credit card at the pump to pay for Jackson's gas. Sawyer said she walked over to the defendant and asked where he had gotten the credit card, because he did not have a job. The defendant did not answer but instead kept "peeping" at a police car that was at the service station.

Sawyer testified that she got into Jackson's vehicle to tell her that something was not right and that Jackson agreed. Sawyer then went into the gas station to ask Hall what was going on, but he did not tell her. Soon afterwards, numerous police cars began pulling up. Sawyer said that the defendant jumped into the passenger seat of Jackson's car and Jackson drove off, while she and Hall went into the service station's restrooms. When she came back out, the police arrested her and took her downtown to answer questions. Sawyer identified her cell phone number on the victim's cell phone bill, which reflected that a call had been placed from the victim's cell phone to her number at 1:33 a.m. on January 23, 2008.

Officer Michael Coburn of the Memphis Police Department testified that he responded to the Shell station early on the morning of January 23, 2008, to find a green Chevrolet HHR parked next to a blue Honda Civic on the north side of the lot and a red

Chevrolet Corsica pulled to the front of the station. He said that he approached the occupants of the Corsica with his weapon drawn but that the vehicle took off. At that point, he put out a dispatch on the vehicle and detained Sawyer, who had exited the service station.

Officer Frederick McKinney of the Memphis Police Department, who was en route to the Shell station, testified that he spotted and stopped the red Corsica a short distance from the station. The defendant was in the passenger seat of the vehicle, and the victim's credit card, bank card, and various forms of identification were in the seat beneath him. Officer McKinney said that when he asked the defendant, who kept expressing concern for his girlfriend, if he realized how much trouble he was in, the defendant responded with the statement, "I wasn't the shooter." Later, after he had driven the defendant to the Shell station and a fellow officer asked him if he had found the keys on the defendant, the defendant announced that he had thrown the keys out the window.

Officer Charles Lowrie of the Memphis Police Department, who participated in the stop of the red Corsica, identified a photograph of the interior of the vehicle, which showed the victim's credit cards and identification on the passenger seat of the vehicle.

Sergeant Kevin Lundy of the Memphis Police Department, who was the case coordinator assigned to investigate the crimes, testified that he interviewed the defendant on January 24, 2008. The defendant initially claimed to have no knowledge of what had happened, but he eventually became more forthcoming, describing the carjacking and robbery and naming the other individuals involved as "Little Chris," or Christopher Taylor; "A. J.," or Anthony Hall; and a third man whom he claimed not to know. Sergeant Lundy said that he later determined that the third man was Montez Duncan, or "Money." Furthermore, he learned from listening to tapes of the defendants's jailhouse conversations that the defendant did, in fact, know Duncan, despite his claims to the contrary.

Sergeant Lundy identified the defendant's statement, which was admitted into evidence and published to the jury. In the statement, the defendant claimed that he was riding around with his companions smoking, was not armed, had no knowledge that they were planning to rob anyone, and did not participate in the kidnapping, robbery, or shooting. He admitted, however, that he used the victim's cell phone and credit card. He described the sequence of events and the extent of his involvement as follows:

> I wake up, Little Chris pull up with some guy in a blue Honda. They leave to go [to] some female's house. Little Chris and the dude come back later that evening. We match a couple of blunts. Little Chris go to the house to get shoes. Then we ride down Airways. They see the [victim]. They pull up by him at a stop sign. AJ asked him two questions. After the second

question, AJ robbed him. Little Chris forced him in the back of his truck. We leave. I remained in the Honda. The dude that was with Little Chris was driving the Honda. We turned around and they followed us. We made a right on Holmes from Airways. We made a left off Holmes on a side street and the Honda got stuck in the mud. AJ and them made a left down another street. I could see the[ir] taillights. The dude that was driving got out and went down there with Little Chris and AJ. I rolled down the window because I wanted to see if they were going to kill [the victim]. I heard one gunshot. I got behind the wheel and got the Honda out [of] the mud. Little Chris and the dude came back and told me to get out [of] the car. So I get out [of] the car. AJ pull up in the truck. So I get in the truck and I tell him to take me to the house. He said, Bro I'm going to smoke this dro blunt with you first. We go to Mapco. He get out the truck then get right back in. We go to the apartments. We all get in the Honda. We smoked a dro blunt. I used the [victim's] phone. I call my gal. I asked her where she at. I said I'm going to come to see you, I'll explain it when I get there. I asked Little Chris could I see the Honda. He throwed me one single black key. He said don't be long, I ain't got no gas. We were on our way to [S]outh Memphis. AJ was in the [t]ruck, he was following me. He made a run on Ball. I made a left on Sparks. I drove to Kerr [S]treet. I explained a short story to my girl what happened. She tell me she need some gas. I tell AJ, let me see that credit card. He didn't want to give it to me straight off. So we go to the gas station. My gal pull up in her red Corsica. I pull up in the Honda. AJ pulled up by me, him and Nene [Sawyer]. I get the cards from AJ. I go over to my gal's car. I put the credit card in there. Then I take it back out. Next thing I know it's a whole scene of police. I get in the car with my gal and we leave. The police pull behind us and I tell her to pull over.

Nineteen-year-old Valerie Jackson testified that the defendant called her from an unfamiliar number early on the morning of January 23, 2008, and that they eventually arranged for him to pick her up at a friend's house. She identified on the victim's cell phone bill the series of telephone calls that she and the defendant exchanged that morning, which began at 1:23 a.m. and ended at 1:44 a.m. She said that when the defendant arrived, driving a blue Honda Civic and followed by Anthony Hall in a green Chevrolet HHR, she asked him what phone he was using and he replied that he had stolen it. She advised him to get rid of it, and he responded by throwing the phone over a gate into a field.

Jackson testified that she rode in the Honda Civic with the defendant as he began following Hall in the Chevrolet HHR to pick up Sawyer at her home. En route, the defendant and Hall stopped at a service station on East Mallory for gas, where Hall parked the

Chevrolet at the pumps and then went inside. Jackson said that after the Chevrolet's tank had been filled, the defendant moved it forward so that he could pull the Honda up to the gas pump to fill its tank as well. Afterwards, the defendant and Jackson followed Hall to Sawyer's house, where Hall picked up Sawyer and a second young girl. Hall, still trailed by the defendant and Jackson, then dropped the young girl off at her father's house.

Jackson, who said that the group's plan was to drive to Whitehaven, testified that she asked to be dropped off to retrieve her own vehicle because she did not like the erratic manner in which both Hall and the defendant were driving. She then explained that the two were swerving back and forth in the lanes and "driving like you don't drive normal cars when it's your car." She said that she told them when they took her to her car that she needed gas and that they followed her to the service station, where she pulled up to the pump and the defendant and Hall parked on the side. She described the defendant's having swiped the credit card to pay for gas, the swarm of police vehicles that descended on the station, her having driven from the station with the defendant as her passenger, and their subsequent stop by the police. She said that the defendant, before they were stopped, kept apologizing to her, telling her that he would take his own charge. At the same time, he kept stuffing something underneath the seat of the car.

The defendant elected not to testify and did not present any witnesses in his defense. Following deliberations, the jury convicted him of the indicted offenses.

## ANALYSIS

The sole issue the defendant raises on appeal is whether the evidence was sufficient to sustain his convictions. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant argues that the evidence was insufficient to sustain his convictions because the victim was unable to identify him as one of the perpetrators, he denied taking any part in the offenses, and his possession of the stolen property was not exclusive. The State disagrees, arguing that the direct and circumstantial evidence was such that the jury could have reasonably concluded that the defendant shared the intent of his companions and aided in the commission of the offenses. We agree with the State.

The defendant was charged with the offenses under a theory of criminal responsibility for the actions of another. Criminal responsibility is not a separate offense but "solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2010).

First degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2010). "Premeditation" is

an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

A person commits criminal attempt when "acting with the kind of culpability otherwise required for the offense[,] . . . acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" Id. § 39-12-101(a)(2).

Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. § 39-13-401(a). Especially aggravated robbery is robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. Id. § 39-13-403(a).

Finally, especially aggravated kidnapping is false imprisonment accomplished with a deadly weapon. Id. § 39-13-305(a)(1). "False imprisonment" is committed when one "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. 39-13-302(a).

The evidence, when viewed in the light most favorable to the State, was sufficient for the jury to find the defendant guilty of the offenses under a theory of criminal responsibility for the actions of another. By the defendant's own admission, he was present when two of his companions jumped from the Honda Civic with pistols to rob and kidnap the victim. Those two, driving the victim in his vehicle, then followed behind the defendant and Duncan as they drove to the Memphis field, where one of the group removed the victim from his car and shot him at point blank range in the back, while the defendant, who was curious as to whether the victim would be killed, lowered his window to listen for the gunshot. Instead of calling for help, the defendant extricated the Civic from the mud before departing with his companions. He later trailed behind Hall, who was driving the victim's stolen vehicle, as the men went to pick up their respective girlfriends. During that time, the defendant used both the victim's cell phone and credit card. We conclude, therefore, that the evidence was sufficient to sustain the defendant's convictions for attempted first degree murder, especially aggravated kidnapping, and especially aggravated robbery.


**CONCLUSION**

Based on our review, we conclude that the evidence was sufficient to sustain the defendant's convictions. Accordingly, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

-8-