# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 4, 2014

## STATE OF TENNESSEE v. DEMARCUS KEYON COLE

**Appeal from the Criminal Court for Madison County**
No. 13-060     Roy B. Morgan, Jr., Judge

No. W2013-02850-CCA-R3-CD  - Filed December 22, 2014

The defendant, Demarcus Keyon Cole, was convicted by a Madison County jury of first degree felony murder and especially aggravated robbery, a Class A felony, and was sentenced by the trial court to consecutive terms of life and twenty years, to be served consecutively to a six-year sentence for a previous conviction. The sole issue the defendant raises on appeal is whether the evidence is sufficient to sustain his convictions. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Lee R. Sparks, Jackson, Tennessee, for the appellant, Demarcus Keyon Cole.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; James G. (Jerry) Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

According to the State's proof at trial, the defendant spent the evening of October 28-29, 2011, using cocaine and partying with friends at his Jackson apartment before he and two accomplices shot and robbed the victim, Demetris Cole. The victim died of his injuries two days later, and the defendant was subsequently indicted for first degree premeditated murder, first degree felony murder, and especially aggravated robbery. The first degree premeditated murder count was, however, nolle prosequied prior to trial.

The first witness at the defendant's trial was Ebony Jenkins, who spent the evening of October 28-29 at the defendant's apartment and was present when the victim was shot. She said the defendant, whom she had known for about a week, picked her up and took her to his apartment at about 9:00 p.m. that night and, after putting his two-year-old son to bed, used cocaine with her in the apartment. The victim arrived at about 10:00 p.m., and the three of them drank beer and smoked marijuana together. She and the defendant used more cocaine, and later some of the defendant's neighbors arrived to purchase marijuana from the victim. At about 1:00 a.m., while the defendant was gone from the apartment, she and the victim had sexual intercourse in a bedroom. At about 3:30 or 4:00 a.m., the victim left to purchase more condoms and some cigarettes and she followed him out the door to get a cigarette from him before he left. Outside, she saw the defendant and two other men in the defendant's truck. She also saw the victim stop briefly to talk with the defendant.

Jenkins testified that when the victim returned to the apartment he received a telephone call from someone wanting to purchase marijuana. She said he was in the living room weighing and bagging the marijuana when the defendant and two other men came into the apartment. As the three men walked to the back of the apartment, the victim asked which one wanted the bag of marijuana. Approximately thirty seconds later, the shorter of the defendant's two companions returned to the living room and said, "This is a f***ing robbery" as he pulled a gun on the victim. At about the same time, the second man came to the front of the apartment. One of the men ordered her to put blankets over her head, and she complied. As she sat on the couch with her head covered, she heard "a commotion" and one of the two men yelling to the victim, "Give me everything in your pockets. I want your money, your cellphone, your wallet, anything that you have in your pockets." Jenkins said she was unable to see anything, but the sounds she heard made her believe that the man she referred to as "the aggressor" was beating the victim.

Jenkins testified that the men called the defendant from the back and she heard the defendant say, "I got a son. I got a son." To her, however, the defendant's words did not sound sincere but instead as if he were putting on "an act" and pretending to be shocked at what was happening. She next heard "the aggressor" ordering the defendant and the second man to leave, the sounds of their footsteps going down the stairs, and the sounds of further struggle between "the aggressor" and the victim. She then heard two gunshots, followed by three more gunshots. After hearing "the aggressor" leave the apartment, she removed the blankets from her head to find the victim lying on the floor covered in blood.

Jenkins testified that she called 9-1-1 on her cell phone. Later, as she was with Sergeant Chestnut of the Jackson Police Department preparing to go to the police department for an interview, she noticed she had a missed call from the defendant on her cell phone. She gave Sergeant Chestnut the defendant's phone number and he tried to reach the defendant

on his cell phone, but the defendant did not answer. At Sergeant Chestnut's request, she then texted the defendant using her own phone and, when the defendant called back, handed her phone to Sergeant Chestnut so that he could talk to the defendant.

On cross-examination, Jenkins clarified that the scuffle between the aggressor and the victim did not ensue until after the defendant had left the apartment. She acknowledged that the defendant was not in the apartment when the victim was shot. She further acknowledged that she never mentioned the defendant's voice having sounded insincere or fake in any of the three separate statements about the incident that she gave to the police. Finally, she testified that on one occasion, the defendant had used the victim's vehicle to pick her up because the victim had borrowed the defendant's vehicle to use on an out-of-town trip.

Officer Brandon Bankston of the Jackson Police Department testified that he was dispatched to the scene at approximately 4:50 a.m. When he arrived at the defendant's apartment, he found Jenkins present and the victim, who had gunshot wounds to the chest and head, lying in front of the living room couch. A lot of blood was in the area, and it appeared as if a struggle had taken place. Although Jenkins informed them that a child had been present in the apartment, no child was located.

Officer Carrie Hart of the Jackson Police Department identified photographs she took of the crime scene, including ones that showed five .32 caliber shell casings and one spent .32 caliber bullet found in the living room and a bag with cocaine residue that was found in the bathroom.

Dr. Michael Revell, an emergency room physician at Jackson-Madison County General Hospital, testified that the victim arrived at the emergency room at approximately 5:30 a.m. in critical condition with gunshot wounds to his head, upper thorax, chest, abdomen, and hip. The victim ultimately became brain dead and passed away on October 31 after his family made the decision to have him removed from the ventilator.

Dr. Feng Li, the medical examiner who performed the autopsy of the victim's body, testified that the victim's cause of death was multiple gunshot wounds.

Aimee Oxley, Director of the Property and Evidence Unit of the Jackson Police Department, testified that no latent fingerprints of value were developed from the shell casings or any other items submitted in the case.

Tennessee Bureau of Investigation Special Agent Forensic Scientist Alex Brodhag, a firearms expert, testified that he determined that all five shell casings recovered in the case were fired from the same gun and that all three bullets – one recovered from the living room

and two from the victim's body – were fired from the same gun. Because he did not have the gun, he was unable to determine whether the shell casings and the bullets were fired from the same gun.

Investigator Gary Davidson, a criminal investigator with the Henderson Police Department, testified that on November 3, 2011, he searched a Henderson home at which the defendant was present and recovered a Samsung AT&T cell phone, which he turned over to Sergeant Chestnut of the Jackson Police Department.

Sergeant Chris Chestnut testified that Jenkins was being detained by patrol officers outside the apartment when he arrived at approximately 5:30 a.m. on the morning of the shooting. In their preliminary conversation, Jenkins told him that the apartment belonged to the defendant but that he had left the apartment immediately prior to the shooting and had not returned. He asked her to ride to the police department with him for a more extensive interview and was sitting with her in his patrol vehicle when she told him that her cell phone, which had been retrieved for her from the defendant's apartment, had a missed call on it from the defendant. She then gave him the defendant's cell phone number, and he called the defendant on his cell phone. When the defendant did not answer, he asked Jenkins to text him using her phone and ask him to call her. Within seconds, the defendant called and Jenkins handed the phone to him.

Sergeant Chestnut testified that the defendant was evasive when he asked him his location. He asked the defendant to meet him at the police department, and the defendant arrived there with his son at 6:40 a.m. and gave a statement. In the statement, which Sergeant Chestnut read aloud to the jury, the defendant claimed that he was a robbery victim and had been forced at gunpoint to drive the perpetrators from the scene. He also claimed that they had spared his life only because he had his young son with him. The defendant's statement reads in pertinent part:

> I left the apartment around 3 a.m. I went and rode around the lot of the Mix Factory. When I was leaving the Mix Factory lot, I saw two dudes walking on Old Hickory. . . . I've seen them in the area before when I've been at my girl's house off Tracewood. I asked the dudes if they had some powder and they said they could get some. They said they wanted $50 for a gram. They got in the truck with me and we rode back to my apartment. I went in my apartment and got some more cash. I got in my truck where the two dudes had stayed while I was in the apartment. We pulled out and was heading toward the bypass. One of the dudes, the short dark-skinned dude, asked me if I knew where he could get some weed. I called [the victim]. [The victim] said he had some weed for sale, and we turned around and went back to my apartment.

Me and the two dudes went in my apartment. When we got in the apartment, the two dudes pulled guns. They told me to get on the ground. I laid down and they started searching my pockets. They were asking [the victim] where the weed was at. I heard one of them smack [the victim]. The taller light-skinned dude told me to get up and leave. The short one had a gun on me while I got my son and left out of the apartment. Me and my son got in my truck, and the short one got in the back seat with my son. He was holding the gun on me. My son was crying. A couple of minutes later I heard three or four gunshots. The dude in my truck told me to crank up the truck and back up. The light-skinned dude got in the truck front passenger's seat and told me to drive. . . . They went through my stuff in my truck. They said for me to stop the truck . . . . They told me that they would kill me if I didn't have my son with me. The last time I saw them they were running down Talbot. . . . When they were robbing us, one of them said they were Crips.

Sergeant Chestnut testified that he processed the defendant's vehicle when he arrived at the police department and found a laptop computer in the backseat and a green and yellow jacket, which the defendant said was his, in the front passenger seat. The defendant also had his cell phone and cash in his pockets. All incoming and outgoing calls, as well as any text messages, had been deleted from the defendant's phone and the defendant was "extremely evasive" when he asked him why. According to Sergeant Chestnut, the defendant gave him "a couple of different answers," including the suggestion that the perpetrators must have done it.

Sergeant Chestnut testified that his next meeting with the defendant was on October 31, 2011, in front of the Tractor Supply store at Carriage House and Highland. During their brief conversation, he informed the defendant of the victim's death, told him that he wanted to ask him more questions, and requested that he follow him to his office. The defendant replied that he needed to shower and eat and would call him back later to meet with him. An hour or two later, the defendant called to tell him he had to take a friend to work but would call him later and meet with him. Still later, the defendant called to tell him he had to attend a meeting at work but would come to his office to talk after the meeting was over. Ultimately, the defendant never met with him on October 31.

Sergeant Chestnut testified that his next meeting with the defendant was on November 2 in the parking lot of the Family Dollar Store in Henderson. He asked the defendant at that time if he owned any firearms, and the defendant "was very adamant that he never owned or possessed any firearms." The defendant told him he was not staying at his apartment but would not disclose where he was currently living, other than that it was in Henderson. In another meeting, the defendant again denied that he owned any firearms. A couple of weeks

later, however, the defendant informed Sergeant Chestnut that he had gone home after meeting with him in his office on October 29 and realized that he was missing two firearms from his apartment. The explanation he provided was that the missing weapons were ones he did not use and did not even realize were in his house until after he noticed them missing. The defendant provided no explanation for why he had gone home to look for weapons that he allegedly had forgotten he owned.

Sergeant Chestnut identified photographs that had been taken by the defendant's phone. These appeared to show two different guns that had been photographed inside the defendant's apartment – a small caliber weapon consistent with a .22, .25, or a .32, and a medium to large caliber semiautomatic firearm. He stated that during the investigation, he never released any information about where the victim had been shot or what caliber weapon had been used. Sergeant Chestnut also identified a photograph of the victim obtained from the surveillance tape of an Exxon at Carriage House and Highland, which showed the victim at 2:56 a.m. on the day of the shooting wearing the same green and yellow jacket that the defendant had in his vehicle later that morning.

Craig Hobson, the human resource generalist at the company where the defendant worked, testified that the defendant did not work on Monday, October 31. On cross-examination, he agreed that he was not the defendant's direct supervisor and therefore would not necessarily have known if the defendant had a meeting with his "boss" on October 31. On redirect, he testified that there was no record of the defendant's having drawn any pay for working on October 31.

Kyneshia Williams, the defendant's girlfriend at the time of the shooting, testified that she had met the victim through the defendant, who purchased cocaine from him. She said the defendant called her at 3:53 a.m. on October 29, 2011, to ask her if she would "set up [the victim] at a store in Jackson so that [the defendant] could rob him." The defendant told her he was hoping to get "dope and money." When she refused to participate, the defendant asked if she was sure and then said, "Well, let me know so I can make other plans." The defendant called her again that night, telling her that he was at his mother's house because his apartment was being cleaned and that he was going to "get off dope" and wanted her to move to Clarksville with him. He said nothing about the victim's having just been shot at his apartment or of his having been kidnapped and robbed. The following Sunday, the defendant showed up at her house. When she asked him about the victim, he told her that the victim had been shot five times with a hollow point .32 caliber weapon – twice in the head, once in the arm, once in the chest, and once somewhere else – and that he was dead. Williams testified that she had been in the defendant's apartment in the past and that the defendant had shown her a .40 caliber silver gun that he kept on top of his mirror in his bedroom and a .32 caliber gun that he kept in his closet.

-6-

The victim's mother, Dosha Howard, identified the store surveillance photograph of the victim wearing his green and yellow jacket. She said she and her family searched for the jacket after the victim's death but were unable to find it.

LeGraine Poston, who acknowledged that he had a conviction for attempted aggravated burglary, testified that in February 2013, he was incarcerated at the Madison County Jail in the same pod as the defendant, who, agitated and seeking advice, told him about his case. According to Poston, the defendant said that he had set the victim up for a robbery because he wanted to "get high," that all that was supposed to happen was a robbery but that things had not gone according to plan, and that he did not want to take the blame for something that someone else had done. He said he waited a couple of months to contact Sergeant Chestnut to tell him what he had learned because it was difficult and dangerous to contact the police while in jail. On cross-examination, he was unable to say why the defendant had picked him to confide in out of all the inmates that shared their pod. On redirect, he testified that in his statement to Sergeant Chestnut, he said that the defendant told him that all the victim had to do was to give up his money.

Sergeant Al Colon of the Jackson Police Department testified that he collected the victim's clothing from the hospital and found $611 in cash in the pocket of the victim's pants.

Curtis Blake Bailey, who acknowledged he was on probation for an aggravated assault conviction, testified that he was housed at the C-Pod of the Madison County Jail with Poston when the defendant, who appeared "skittish," was brought to the jail. He said he saw the defendant talking with Poston that night. He never saw the defendant talking with anyone else and, after that first night, did not see the defendant again.

Patrick Williams, a senior GIS analyst for the City of Jackson-Madison County Planning Department, testified that he had, at the request of the prosecutor, prepared a map of the city showing various cell phone calls with their times and the cell phone towers that had transmitted the calls.

William C. Carroll, a senior investigator with AT&T, identified the defendant's cell phone records, which were introduced as an exhibit. Using the cell phone records and the map that had been prepared by Patrick Williams, Carroll testified that the defendant's cell phone either placed or received a total of twenty-nine phone calls between 4:50 a.m., when Jenkins' 9-1-1 call was placed, and 6:00 a.m. The records indicated that the defendant was moving from one location in the city to another during that time and that he never called 9-1-1 or law enforcement.

-7-

The defendant elected not to testify and rested his case without presenting any witnesses. Following deliberations, the jury convicted him of first degree felony murder and especially aggravated robbery.

## ANALYSIS

### Sufficiency of the Evidence

The sole issue the defendant raises on appeal is whether the evidence is sufficient to sustain his convictions. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant argues that the evidence is insufficient to sustain his convictions

because there was no proof from which the jury could find that he "acted in concert with two other individuals to rob [the victim]." In support, he points to the fact that he was not present when the victim was shot and killed and had no marijuana in his possession after the crime. He also points to the fact that the victim still had cash in his pockets and the testimony of Ebony Jenkins that he and the victim traded cars, which, according to the defendant, makes it likely that the victim's jacket was simply left in his vehicle rather than stolen.

We conclude, however, that the evidence, when viewed in the light most favorable to the State, is sufficient to sustain the convictions. The defendant's girlfriend, Kyneshia Williams, testified that the defendant called her early on the morning of the robbery asking her to set the victim up so that he could rob him. When she refused, the defendant said he would have to make other plans. After the robbery, the defendant called Williams again without mentioning that he and his son had been the victim of a robbery and kidnapping. Later, the defendant provided details to Williams about the victim's manner of death, which had not been released to the public. Ebony Jenkins testified that the defendant's voice sounded fake during the robbery, as if he were playing a part, and the defendant never called the police after the robbery to report either the robbery of the victim or the alleged robbery and kidnapping of himself and his young son. He was also evasive with police about his whereabouts, deleted his phone records, and gave conflicting stories about his gun ownership. Finally, the defendant told a fellow inmate at the jail that he had set the victim up for a robbery but that things had gotten out of hand and the victim had been killed. From all of this evidence, a rational jury could have reasonably concluded that the defendant was not a victim but instead a participant in the crimes. We conclude, therefore, that the evidence is sufficient to sustain the defendant's convictions for first degree felony murder and especially aggravated robbery.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE