IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2017

**STATE OF TENNESSEE v. DWIGHT GOSSETT**

**Appeal from the Criminal Court for Shelby County**
**No. 12-01774    Lee V. Coffee, Judge**

_____

**No. W2016-02159-CCA-R3-CD**

_____

The Defendant, Dwight Gossett, was convicted in the Shelby County Criminal Court of aggravated sexual battery, a Class B felony, and sentenced by the trial court to twelve years at 100% in the Department of Correction. The sole issue he raises on appeal is whether the evidence was sufficient to sustain his conviction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J. ROSS DYER, JJ., joined.

Monica A. Timmerman, Bartlett, Tennessee (on appeal); and Lauren Pasley, Memphis, Tennessee (at trial), for the appellant, Dwight Gossett.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carrie Shelton and Bryce H. Phillips, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On September 2, 2010, eight-year-old A.R.[1] and her six-year-old sister, A.C.R., reported to their mother that the Defendant, their stepgrandfather at the time, had touched

_____

[1] To protect the privacy of the minors, we identify them by their initials only.

them inappropriately during visits to their grandmother's home. Following an investigation, the Defendant was indicted for two counts of aggravated sexual battery, with one count based on his behavior with A.R. and the second count based on his behavior with A.C.R. In 2013, he was tried before a Shelby County Criminal Court jury, convicted of both counts, and sentenced by the trial court to an effective term of twenty-four years in the Department of Correction at 100% release eligibility. State v. Dwight Gossett, No. W2013-01120-CCA-R3-CD, 2014 WL 6609353, at *1 (Tenn. Crim. App. Nov. 21, 2014). On direct appeal, this court reversed the convictions and remanded for a new trial on the basis that the trial court improperly admitted thirty-plus-year-old evidence of the Defendant's alleged sexual relationship with a former minor stepdaughter, and the prosecutor engaged in improper closing argument by suggesting that a conviction would provide justice not only for A.R. and A.C.R. but also for the Defendant's former stepdaughter. Id. at *9-10, *17. At the conclusion of the Defendant's second trial, the jury convicted him of the count involving A.C.R. and acquitted him of the count involving A.R.

At the February 2016 retrial, Lieutenant Carl J. Ray of the Memphis Police Department, who was an Investigative Sergeant at the Child Advocacy Center in September 2010, identified the Defendant's September 16, 2010 signed waiver of rights and written statement, which were admitted as exhibits and published to the jury. Lieutenant Ray testified that he did not provide any specifics of the allegations during his interview with the Defendant. The statement reflects that when Lieutenant Ray asked the Defendant to tell him in his own words what had occurred to bring about the girls' allegations, the Defendant replied:

> Prior to this I only heard about [A.C.R.] There was an incident several months ago. I can't tell you exactly when. I was changing my shirt in my room and she would not leave. She started bragging about what she has seen on other males including full exposure of the genitals and touching. I said, "Mean like this," and I touch my belt buckle with her hand and that was about -- I'm pretty sure I left something out[.] There was a shock look on her face, looking surprised that I called her on her bragging. From that point on, I never had a problem getting her out of my room.

Elsewhere in the statement, the Defendant denied that he had pulled down his boxer shorts and exposed himself to A.C.R. and A.R. while instructing A.R. to touch his penis, that he kissed A.R. on the breasts, or that he inappropriately touched either child. The Defendant explained that he could have inadvertently touched the victims' breast areas while picking them up because they were small children and he had large hands.

- 2 -

On cross-examination, Lieutenant Ray acknowledged that the Defendant voluntarily came to the sex crimes office to be interviewed.

The victims' sixteen-year-old cousin, C.J., testified that on Labor Day 2010, he and his sister were seated together with A.R. and A.C.R. at a Memphis pizza restaurant when A.C.R. whispered to him that her grandfather had "made her touch his private parts." C.J. said he was shocked, so he got up and "told the parents," who were seated at a separate table in the restaurant. On cross-examination, C.J. testified that before A.C.R. made the whispered revelation, she told him that she had a secret to tell him. He said she had never before shared secrets with him and that they were not particularly close.

The victims' mother testified that on September 2, 2010, she was eating dinner at the pizza restaurant with C.J.'s mother when C.J.'s mother told her that C.J. had just looked at her and made a funny face. C.J.'s mother called C.J. over to their table to ask what was going on and he responded that they needed to ask A.R. and A.C.R. When the victims' mother realized that the victims had confided to C.J. that something inappropriate was going on, she left the restaurant and took the victims home, where they talked. Afterwards, she called her mother, her husband, and the police. Police officers came to her home that night to take a report and she later took the girls to the Child Advocacy Center, where they were interviewed outside her presence.

The victims' mother testified that in September 2010, A.R. was eight years old and A.C.R. was six years old. The victims had a younger sister and a brother, who was a baby in 2010. During that summer, her husband was in Iraq, and she frequently left the children at her mother's home on Sunday afternoons so that she could run errands. At that time, the Defendant was married to her mother and lived with her mother in the same home. The victims' mother testified that she talked to the victims about what had happened when she took them home from the pizza restaurant on Labor Day evening, but she did not instruct them what to say during their interviews at the Child Advocacy Center. Prior to the September 2 revelations, she had no indication that anything was wrong; the victims had never before complained of either the Defendant or anyone else touching them inappropriately.

On cross-examination, the victims' mother testified that, after the incident, the victims continued to do well in school and did not participate in any formal counseling. In response to questions from the jury, she testified that the victims had a strong support system at their church and did not feel that they needed counseling. The victims' mother said she had not had any problems with the Defendant before the night of the victims' revelations. The Defendant moved out of the victims' grandmother's home that same night, and the couple subsequently divorced. When asked exactly what the victims told her on Labor Day, the victims' mother testified that A.C. R. told her about an incident

that occurred in the Defendant's bedroom when he took her hand and stuck it down his pants onto his genitals.

A.R. testified that she was thirteen years old and in the eighth grade. She identified the Defendant as her former stepgrandfather and testified that when she was eight years old and her father was in Iraq, she and her sisters spent Sunday afternoons and some overnights with her grandmother and the Defendant in their home. One day during that summer, she and her sisters were playing dress-up in her grandmother's room when she went outside alone to see if their new "kiddie pool" was ready for use. She recalled that she was wearing her dress-up clothes at the time, which consisted of a "little tutu" that came down to her knees and one of her grandmother's tank tops, which she had pinned up with a ponytail holder. She said she asked the Defendant about the pool, and he came over to where she was standing on the porch, answered her question, hugged her, pulled her shirt down, kissed her twice on one breast, and asked her if she liked it. She answered, "No," and the Defendant said, "Don't tell anybody." She then ran into the house.

A.R. testified that she went back to her grandmother's room and began playing dress-up again without telling anyone what had happened. Her sisters were putting their swimsuits on in preparation for playing in the pool, but she no longer wanted to play in the pool and stayed inside. A.R. explained that she did not tell her grandmother what had just happened because she was afraid she would get into trouble because she had just "stood there" without doing anything. She eventually told her little sister, A.C.R., with whom she was very close, but told her that they should not say anything to anyone else because they might get in trouble.

A.R. recounted three other episodes that occurred after the pool incident in which the Defendant engaged in inappropriate behavior. In the first, she had bent over to pick up a piece of paper when she was retrieving some coloring paper and markers from the Defendant's bedroom, where he was working on his computer, when she saw the Defendant reaching towards her "general girl area[.]" She pulled away, and the Defendant turned back to his computer without saying anything. In the second, she bumped into the Defendant as she was running inside the house to get some popsicles, and the Defendant pointed to his penis and asked if she wanted to touch it. In the third, she and A.C.R. were together in the Defendant's bedroom when he asked if they wanted to see his penis and then pulled down his pants and boxers, exposing himself to them.

A.R. testified that she told A.C.R. about the coloring paper and popsicle incidents because she told A.C.R. everything. A.C.R. told her about her similar experiences with the Defendant, and she and A.C.R. made a pact to tell each other everything that

happened involving the Defendant. They did not, however, tell any adults because they were still worried that they would get in trouble if they did so.

A.R. testified that when she and A.C.R. were eating with C.J. at the pizza restaurant, A.C.R., who was sitting beside C.J., whispered something to him that caused him to make a face. C.J.'s mother called C.J. over to ask what they were talking about, and C.J. told her. A.R. said that she was scared because she still thought at that time that she and A.C.R. would get into trouble. She stated that she and A.C.R. later talked to their mother, their grandmother, and a woman at the Child Advocacy Center.

A.R. identified the DVD of her interview at the Child Advocacy Center, which was admitted as an exhibit and played for the jury. The account that A.R. provided in her interview as an eight-year-old was essentially the same as her trial testimony, with the exception that, as an eight-year-old, she said she had immediately reported the Defendant's behavior to her grandmother, but her grandmother did not believe her. Elsewhere in the interview, however, she appeared to have a confused sense of time, telling the interviewer that her grandmother and the Defendant broke up on the same night that she told her grandmother about the abuse. She also said that when she told her grandmother about the abuse, she said that the Defendant was "sexy." She told the interviewer that she did not know what that word meant.

On cross-examination, A.R. reiterated that she did not tell her mother or grandmother about the incidents because of her "child mindset" at that time that she would get in trouble if she told. In response to a question from a juror, A.R. testified that she recalled having told her grandmother that the Defendant was "sexy" when she was attempting to tell her about the abuse. She said she used the word because she thought that it meant something bad, but her grandmother did not understand what she was trying to tell her.

A.C.R., who said she was twelve years old and in the sixth grade, testified that she had an older sister, a younger sister, and a brother, who was born in February 2010. She recalled that when her brother was a baby and she was spending time at the home of her grandmother and the Defendant, she was in the Defendant's room when he stood up from his desk chair, unbuckled his pants, and put her hand down the front of his pants so that her palm touched his bare flesh. She said she tried to "scoot" her hand to the side and thought that she touched his inner thigh instead of his genitals, but she was not sure. She testified that she pulled her hand out and ran to the bathroom to wash her hands because it was "disgusting" to think of her hand so close to his genitals. She told A.R. in the bathroom what had happened, but she did not tell anyone else because she was afraid she would get into trouble.

A.C.R. testified that the Defendant did not say anything to her during the incident but told her "Shh" right before she pulled her arm out of his pants. She said she never told the Defendant that she had seen or touched a penis before. She stated that A.R. did not tell her of the Defendant's having done anything to her and that she could not recall their having talked about it further. She did recall, however, that either she or A.R. told their cousin about it at the pizza restaurant and that her cousin had a surprised look on his face, which caused her aunt and her mother to call him over to them.

A.C.R. identified the DVD of her forensic interview at the Child Advocacy Center, which was played before the jury and admitted as an exhibit at trial. In the forensic interview, A.C.R. said that the Defendant unbuttoned his pants, took her hand and "made [her] touch it." She, apparently, then demonstrated on an anatomically correct doll how the Defendant took her hand and forced her to touch what she called his "front bottom" area inside his clothes.[2] She said she touched his skin, but she denied that she touched his actual "front bottom," stating that she tried to "scoot" her hand over so she did not have to touch his penis. She said she reported the incident to A.R. by telling her that the Defendant "just made [her] touch him on his bottom." A.C.R. told the interviewer that nothing similar had ever happened with the Defendant.

A.C.R. testified she was certain she touched the Defendant's skin but did not know if she touched his genitals. On cross-examination, she could not explain why she had not told an adult other than to reiterate that, as a six-year-old, she thought she had done something wrong and would get into trouble.

Patricia Lewis, the Forensic Interview Program Manager at the Child Advocacy Center, testified that she conducted the forensic interview of A.C.R. while a second forensic interviewer conducted the interview of A.R. Ms. Lewis explained the interview procedures and processes employed in forensic child interviews, including their use of open-ended questions and anatomical dolls to help a child clarify what he or she is trying to convey. She said their goal at the Child Advocacy Center was not to get a child to say something had happened but instead to get the child to tell them the truth.

The Defendant elected not to testify and rested his case without presenting any proof. Following deliberations, the jury acquitted him of the aggravated sexual battery of A.R. but convicted him of the aggravated sexual battery of A.C.R., for which the trial

---

[2] The DVD itself, although admitted as an exhibit, was retained by the Criminal Court of Shelby County unless requested by this court. We find it unnecessary to review the actual DVD for the purposes of this appeal, as the interview was transcribed by the court reporter as part of the trial transcript in the case.

court subsequently sentenced him as Range I offender to twelve years at 100% in the Department of Correction. This appeal followed.

## ANALYSIS

On appeal, the Defendant contends that the only evidence in support of his conviction was the testimony of A.C.R., which was "inherently unreliable" "[d]ue to the significant amount of time that had passed between the alleged incident and the trial." The State notes that credibility determinations are within the province of the jury and argues that the evidence was sufficient to sustain the Defendant's conviction. We agree with the State.

When the sufficiency of the conviction evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). Questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

"A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Aggravated sexual battery "is unlawful sexual contact with a victim by the defendant or the defendant by a victim" when "[t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4) (2014). "Sexual contact" is defined as including "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6). "'Intimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. § 39-13-501(2).

A.C.R. testified at trial that when she was approximately six years old and alone with the Defendant in his room, he stood up from his desk chair, unbuckled his pants, took her hand, and shoved her arm down the front of his pants inside his clothing so that her hand touched his bare skin on what she thought was his inner thigh but could have been his penis. She further testified that she was so disgusted by the thought of her hand being so close to his genitals that she immediately ran to the bathroom to wash her hands.

A.C.R.'s trial testimony was corroborated by the DVD of her forensic interview at the Child Advocacy Center, made close in time to when the incident transpired. It was also corroborated by her mother's testimony that A.C.R. told her on Labor Day 2010 about the incident in the Defendant's room in which the Defendant forced A.C.R.'s hand inside his pants and onto his genitals. Furthermore, the Defendant's own statement to police, although he tried to put a different spin on the circumstances, provided at least a partial corroboration of A.C.R.'s account of the incident. In sum, there was more than sufficient evidence from which a rational jury could have found the Defendant guilty of the aggravated sexual battery of A.C.R. beyond a reasonable doubt. Accordingly, we affirm the Defendant's conviction.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

- 8 -