IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 5, 2019

### STATE OF TENNESSEE v. CHEW CORNELIUS SAWYER

**Appeal from the Circuit Court for Madison County**
**No. 18-153    Roy B. Morgan, Jr., Judge**

_____

### No. W2018-01267-CCA-R3-CD

_____

The Defendant, Chew Cornelius Sawyer, was convicted by a Madison County Circuit Court jury of aggravated assault, a Class C felony; attempted aggravated burglary, a Class D felony; and convicted felon in possession of a firearm, a Class C felony, and was sentenced to an effective term of five years in the Department of Correction.  On appeal, he challenges the sufficiency of the convicting evidence.  After review, we affirm the judgments of the trial court.

### Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

George M. Googe, District Public Defender; Jeremy B. Epperson, Assistant District Public Defender, for the appellant, Chew Cornelius Sawyer.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Rolf Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The Defendant was indicted for aggravated assault, attempted aggravated burglary, employing a firearm during the commission of a dangerous felony, convicted felon in possession of a firearm, and tampering with evidence as a result of his altercation with the victim, Edmond Adams, outside the victim's home.

The victim testified that on March 16, 2016, he and his girlfriend, Candy Person, and his two children resided at 95 Cloverdale Street in Madison County. The victim recalled that he left his house that morning to get a cigarette from his brother who lived nearby and when he returned around 9:00 a.m., the Defendant was on his porch. The victim told the Defendant that he needed to leave, but the Defendant responded that he was waiting for his girlfriend who was inside the house. The victim checked with Ms. Person inside and learned that no one was there except for her and the children. The victim went outside to tell the Defendant that his girlfriend was not in the house and that he needed to leave. The men shared a cigarette and then the victim went back inside.

The victim testified that he noticed over the course of the day that the Defendant continued to hang around outside his home. Finally, around 7:00 p.m., the Defendant knocked very loudly on the victim's door and when the victim opened it, he saw that the Defendant had his hand down by his side near the butt of a gun. The victim worried that the Defendant might begin shooting, so he told his family to hide in the bathroom and call the police. He then grabbed a knife and went outside. The Defendant told the victim a story about how the Defendant's girlfriend had associated the victim's car with some missing money or drugs, and he suggested that the police might find the victim's dead body in the vacant house next door.

The victim testified that the Defendant reached for his gun and started to raise it toward him, at which point he stabbed the Defendant in the neck in order to defend himself. The Defendant fell to the ground, stumbled for a bit, and then made his way back to his vehicle. However, instead of driving away, the Defendant began loading his gun. The victim ran back into the house to protect his family. The Defendant followed and began kicking at the door to get inside, finally knocking a hole in the lower panel of the door and attempting to reach inside. The victim was afraid for himself and his family because the Defendant had a gun, and he only had a knife. The Defendant eventually stopped and sat down on the curb, and the police arrived soon after.

On cross-examination, the victim admitted that in his statement to police, he said that the Defendant originally showed up at his home around 4:00 p.m. However, he insisted that his first contact with the Defendant occurred around 9:00 a.m.

Candy Person, the victim's girlfriend, testified similarly, except she stated that the sequence of events began in the afternoon rather than the morning. She said that the victim had gone to the store and when he got home, he asked if anyone else was inside. She told him no, and he went outside where she saw him talking to the Defendant. The victim told the Defendant to get out of the yard, and the Defendant eventually went and sat in his vehicle that was parked on the street. About thirty minutes to an hour later, Ms. Person noticed that the Defendant was still outside. Some point after that, the Defendant

knocked on the door, and the victim answered it and announced that the Defendant had a gun.

Ms. Person said that the victim went outside to talk to the Defendant. She lost sight of the men for a few minutes but could still hear them talking. The victim came back inside, and the Defendant went back to his vehicle where Ms. Person saw him making a hand motion like he was putting bullets in a gun. The victim told her to call the police and hide in the bathroom. From the bathroom, Ms. Person heard several loud "booms" and, when she came out, saw a hole in her front door. Ms. Person said that the Defendant did not have permission to enter their home and that the incident was "terrif[ying][.]"

On cross-examination, Ms. Person acknowledged that her statement to police did not include any reference to seeing the Defendant making a "hand motion of putting bullets in the gun" when he went back to his vehicle. However, she explained that there "was so much going on and [she] was just terrified, [she] only told what [she] could remember at the time." Ms. Person admitted to having a prior conviction for perjury.

Officer Jonathan Childs and Investigator Michael Arnold with the Jackson Police Department were among the officers who responded to the scene. The officers encountered the Defendant, who was bleeding from a stab wound to his neck and claiming that someone named Ced had stabbed him for no reason. The officers took statements from the victim and Ms. Person, as well as photographed the scene and collected evidence. The front door of the victim's home had been damaged, and a blood trail led to the house next door where a pistol with blood on it was located under some wooden steps with blood on them.

Called to testify for the defense, Investigator Darrell Listenbee with the Jackson Police Department stated that in order to load the gun recovered in this case, someone would have to use their hands and fingers to accomplish the task. However, no evidence was submitted in the case for fingerprint or DNA analysis, despite the availability of such tests.

The Defendant testified that someone named Lafayette, whom he understood to be the victim's cousin, owed him money and asked him to meet at the victim's home to collect the debt. He went to the victim's residence around 5:00 p.m. on the day in question and encountered the victim. The victim told him that Lafayette was not there and that he could not wait for him on the porch, so the Defendant went to his vehicle to wait. At some point, the victim came outside and asked for a cigarette, and then went back inside his house. After Lafayette failed to show up, the Defendant knocked on the victim's door and asked if he had heard from Lafayette. While they were talking, the

victim stabbed the Defendant in the neck, and the two scuffled. The front door to the victim's house was damaged in the fracas. The victim pointed a gun at him through a hole in the door, and the Defendant used his bloody shirt to knock the gun away from the victim and ran for help. As he ran, the Defendant saw the victim run to the house next door and then back to his house.

The Defendant maintained that the victim was the only one who utilized a gun and surmised that his blood was transferred to the gun from his bloody shirt during the altercation. He said that he did not attempt to kick in the door to the victim's house. The Defendant acknowledged having a prior felony conviction.

The Defendant's motion for judgment of acquittal was granted on the charges of employing a firearm during the commission of a dangerous felony and tampering with evidence, and the jury convicted him of aggravated assault, attempted aggravated burglary, and convicted felon in possession of a firearm.

## ANALYSIS

On appeal, the Defendant argues that the evidence is insufficient to sustain his convictions. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human

atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In the light most favorable to the State, the evidence shows that the Defendant pulled a gun on the victim and tried to enter his home by kicking down the front door. The Defendant does not contend that the State failed to prove any elements of the offenses but instead asserts that the State's witnesses were not credible and that the State failed to have fingerprint or DNA analysis performed, despite the availability of such tests. However, questions concerning the credibility of the witnesses were resolved by the jury as the trier of fact. The jury heard the testimony and the inconsistencies pointed out by the Defendant and, as is its prerogative, accredited the State's evidence. Moreover, physical proof consisting of the stab wound to the Defendant's neck, a blood trail leading from the victim's porch to the porch of the home next door underneath which was found a gun with blood on it, and the hole that was kicked in the lower portion of the victim's front door corroborated the victim's testimony. Furthermore, the lack of fingerprint or DNA analysis does not affect the sufficiency of the evidence presented. We conclude that the proof was sufficient for a rational trier of fact to find the Defendant guilty of aggravated assault, attempted aggravated burglary, and convicted felon in possession of a firearm.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

____________________________________

ALAN E. GLENN, JUDGE